Tony LEE, Ramachandran Palissery, and Ralph Talarico, for themselves and all those similarly situated, Plaintiffs,

v.

The LIFE INSURANCE COMPANY OF NORTH AMERICA, the University of Rhode Island, Mr. Edward Eddy, Mr. Robert Carothers, Mr. Blaise Morrissey, the State of Rhode Island and Providence Plantations Board of Governors for Higher Education, and One or More John Does, individually, jointly and severally in both their corporate capacities, and in their personal and official capacities, Defendants.

Civ. A. No. 92–0058 P.

United States District Court, D. Rhode Island.

Aug. 5, 1993.

532

Keven A. McKenna, Pawtucket, RI, Sinclair T. Banks, W. Kingston, RI, for plaintiffs.

Michele A. Theroux, Charles J. McGovern, William P. Devereaux, McGovern, Noel & Benik, Providence, RI, for defendant Life Ins. Co. of North America.

Jay S. Goodman, Mandell, Goodman, DeLuca & Schwartz, Providence, RI, for defendants URI, Eddy, Carothers, Morrissey & Bd. of Governors.

## MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

This is a class action lawsuit on behalf of current and former students at the University of Rhode Island ("URI" or "the universi-

ty").[1] Plaintiffs allege a multitude of federal and state claims attacking the university's mandatory health clinic fee and health insurance requirement. Jurisdiction is premised on 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1337(a) (antitrust); 28 U.S.C. § 1343(a) (civil rights); and 28 U.S.C. § 1367(a) (supplemental).

Defendants have moved to dismiss this suit under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. For the reasons stated below, I grant defendants' motion with respect to all federal claims. In addition, I decline to exercise supplemental jurisdiction over the pendant state claims, and dismiss those claims without prejudice.

## I. *Standard of Review*

 It is not proper to dismiss a complaint under Fed.R.Civ.P. 12(b)(6) unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). In making this determination, a court should accept the well-pleaded complaint as true and indulge every reasonable inference in favor of the plaintiff. *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 52 (1st Cir.1990). This standard of review "does not mean, however, that a court must (or should) accept every allegation made by the complainant, no matter how conclusory or generalized." *U.S. v. Avx Corp.,* 962 F.2d 108, 115 (1st Cir.1992).

## II. *Background*

URI operates a University Health Services ("UHS" or "health clinic") on its Kingston, Rhode Island campus. UHS offers ambulatory services and health education to URI undergraduate and graduate students by walk-in or by appointment. It is open 24 hours per day, seven days per week during the academic year.

URI imposes a mandatory health clinic fee for full-time undergraduate and graduate students. Full-time graduate students may only waive the health clinic fee if they are a member of a health maintenance organization, or a member or dependent of the military. Undergraduate students may only waive the fee if they enroll in fewer than 12 hours per semester. In 1991–92, the health clinic fee was $124.00 per semester.

URI also requires full-time students to carry health insurance to supplement the medical coverage provided through UHS. Students may satisfy this requirement in two ways. They may (1) purchase a private health insurance policy offered through URI or (2) demonstrate that they have "comparable coverage" through some other health insurance plan. In 1990–91 and 1991–92, the URI-sponsored policy was available through defendant The Life Insurance Company of North America ("LINA"). The cost of the LINA policy (12 month coverage) was $282.00 for 1990–91 and $330.00 for 1991–92.

The LINA plan was designed to "dovetail" with medical services provided at UHS. Thus, a student enrolled in the LINA plan would only pay for coverage of health services not provided through the student's mandatory health clinic fee. Additionally, under the LINA plan, insurance coverage was only available if students first sought medical assistance from UHS. If necessary, a student was then referred to an outside health care provider by UHS. If UHS was closed (e.g., during official university holidays and the summer), students were required to notify UHS of any medical actions taken.

Students opting for "comparable" plans in 1990–91 and 1991–92 were required to submit a waiver card to the university by a date certain. Failure to submit the waiver card resulted in automatic enrollment in, and billing for, the LINA plan. If the LINA bill was not paid, URI prohibited future registration of that student. URI warned its students in writing that comparable coverage plans must pay for laboratory tests, x-rays, orthopedic supplies and selected gynecological procedures performed at UHS. URI also cautioned its students that Rhode Island Blue Cross and health maintenance organiza-

---

1. No plaintiff class is currently certified. All parties have agreed to a stay of plaintiffs' motion for class certification pending resolution of defendants' motion to dismiss.

tions in Rhode Island were not deemed "comparable" plans.

In 1990–91 and 1991–92, approximately 40% of the more than 10,000 URI students acquired health insurance through LINA. The remaining 60% obtained coverage from other carriers. While the university claims that it makes no profit on the insurance requirement, it does collect a $10.00 administrative fee for processing each student. In addition, UHS is supported, in part, by the laboratory, x-ray, orthopedics and gynecological fees that are paid by student insurance carriers.

On January 31, 1992, plaintiffs filed the present action. Unfortunately, there is no simple way to summarize plaintiffs' legal theories. They have adopted an everything-but-the-kitchen-sink approach to this case. Plaintiffs' amended complaint is a 45 page single-spaced document crammed full of federal and state claims. On the federal side, there are numerous antitrust allegations, as well as claims under the Equal Protection and Due Process clauses of the Fourteenth Amendment to the United States Constitution. On the state side, plaintiffs' claims include Money Had and Received, Breach of Contract, Duress, Undue Influence, Negligent Misrepresentation, Innocent Misrepresentation, Breach of Insurer's Duty to Deal Fairly and in Good Faith, Negligence, Breach of Implied Contract, Breach of Fiduciary Duty and Ultra Vires. Plaintiffs also assert equal protection and due process claims under the Rhode Island Constitution, and claims under Rhode Island antitrust statutes.[2] At its core, this suit seeks to recoup health clinic fees and LINA insurance premiums paid by plaintiff URI students, plus treble damages for antitrust violations.

### III. Discussion

#### A. Federal Antitrust Claims

I begin my scrutiny of the amended complaint with the federal antitrust allegations (Counts VII, XVI). Plaintiffs advance three sets of antitrust claims: (1) conspiracy claims under § 1 of the Sherman Act; (2) per se tying claims under § 1 of the Sherman Act; and (3) conspiracy to monopolize claims under § 2 of the Sherman Act. Defendants' primary argument in support of their motion to dismiss is that plaintiffs have failed to adequately allege the essential elements of any antitrust violations.[3]

##### 1. Conspiracy Claims Under § 1 of the Sherman Act

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Despite this sweeping language, the U.S. Supreme Court has long recognized that the Act prohibits only *unreasonable* restraints of trade. *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 723, 108 S.Ct. 1515, 1518, 99 L.Ed.2d 808 (1988).

To determine unreasonable restraint of trade, courts generally evaluate the alleged anticompetitive actions "through case-by-case

---

2. Plaintiffs' sweeping litigation strategy is not confined to their complaint. Plaintiffs originally filed with this Court a two volume, *357 page single-spaced* Memorandum In Support Of Their Objection To Defendants' 12(b)(6) Motion To Dismiss. This Court then directed plaintiffs to resubmit a memorandum of law not more than 60 double-spaced pages. Plaintiffs only superficially complied with the Court's instructions. While they did file a 60 page abbreviated memorandum, plaintiffs repeatedly cross-reference crucial material in the abbreviated memorandum to voluminous passages contained in the original 357 page brief. In the interests of judicial economy, this Court has overlooked plaintiffs' mishandling of this motion and considered arguments contained in both the original and abbreviated filings.

3. Defendants also contend that they have antitrust immunity from suit based upon three separate grounds: (1) the McCarran–Ferguson Act, 15 U.S.C. §§ 1011–15, which provides an antitrust exemption for the "business of insurance"; (2) the so-called "state-action" doctrine, which offers immunity for actions taken by state government and certain private actors; and (3) the Local Government Antitrust Act, 15 U.S.C. §§ 34–36, which bars antitrust damage actions against local governments, including "special function governmental unit[s] established by State law in one or more States." Because I hold that plaintiffs have failed to state a valid claim under either § 1 or § 2 of the Sherman Act, there is no need to address these defenses.

application of the so-called rule of reason test—that is, 'the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.'" *Id.* (quoting *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977)). In the First Circuit's words, "[t]he 'rule of reason' limits the Act's literal words by forbidding only those arrangements the anticompetitive consequences of which outweigh their legitimate business justifications ..." *Clamp–All Corp. v. Cast Iron Soil Pipe Institute*, 851 F.2d 478, 486 (1st Cir.1988), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989). In this special context, the term "'anticompetitive' ... refers not to actions that merely injure individual competitors, but rather to actions that harm the competitive process. And, the law assesses both harms and benefits in light of the Act's basic objectives, the protection of a competitive process that brings to consumers the benefits of lower prices, better products, and more efficient production methods." *Id.* (citations omitted).

█ In limited circumstances, courts will apply a *per se* standard to antitrust allegations under § 1. The *per se* approach is appropriate where the challenged conduct is "manifestly anticompetitive" and thus no in-depth analysis of the market effect is necessary. *Business Electronics*, 485 U.S. at 723–24, 108 S.Ct. at 1519. Examples of *per se* violations include price-fixing schemes and concerted refusals to deal. *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 9 and n. 10, 104 S.Ct. 1551, 1156 and n. 10, 80 L.Ed.2d 2 (1984); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 593 (1st Cir.1993).

█ Thus, to state a valid claim under § 1 of the Sherman Act, a plaintiff must allege three elements: (1) the existence of a contract, combination or conspiracy; (2) that the agreement unreasonably restrained trade under the *per se* or rule of reason analysis; and (3) that the restraint affected interstate commerce. *See Bhan v. NME Hosp., Inc.*, 929 F.2d 1404, 1410 (9th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 617, 116 L.Ed.2d 639

(1991). *See also* ABA Antitrust Section, *Antitrust Law Developments* 2 (3d ed. 1992).

In the present case, plaintiffs allege a litany of interconnected claims under § 1 of the Sherman Act that relate to some type of conspiracy or exclusionary arrangement between URI and LINA:

(1) URI and LINA conspired in imposing the mandatory clinic fee and insurance requirement. Amended Complaint at ¶¶ 97, 112, 152, 255, 256.

(2) URI and LINA conspired in requiring students covered by LINA to first seek treatment at the URI clinic to obtain insurance coverage. Amended Complaint at ¶¶ 113, 114.

(3) URI and LINA conspired to dictate alternative insurance coverage (i.e., non-LINA) in terms of the health clinic's revenue raising procedures. Amended Complaint at ¶ 127.

(4) URI and LINA conspired to automatically charge some students for the full annual amount of the LINA plan, even though LINA coverage did not actually begin until students paid their bill. Amended Complaint at ¶ 106.

(5) URI and LINA conspired to require "more of a non-LINA policy than is furnished by the LINA policy." Amended Complaint at ¶ 120.

(6) URI and LINA conspired in "carrying out URI's requirement that male students have health insurance that includes coverage for gynecological services ..." Amended Complaint at ¶ 134.

(7) URI and LINA conspired in "the URI clinic fee's inclusion of a female coverage component for men ..." Amended Complaint at ¶ 138.

█ Plaintiffs appear to concede that these allegations should be viewed through the rule of reason lens. But they argue that the anticompetitive nature of the mandatory health clinic fee and insurance requirement is "self-evident." Plaintiffs' Abbreviated Memorandum at 23. I believe that the rule of reason approach is proper in this case. Plaintiffs do not cite any cases to support a *per se* violation, and this Court's research has not unearthed any such precedent. Given

this finding, plaintiffs' conspiracy claims must be dismissed.

■ Plaintiffs' amended complaint does not present sufficient facts to indicate how these challenged actions unreasonably restrained trade in any relevant market, or had significant adverse effects on competition. Only two facts in the amended complaint shed any light on anticompetitive effects. The first is that Rhode Island Blue Cross and health maintenance organizations in Rhode Island were not considered "comparable" insurance plans. The second is that the LINA plan was intentionally "dovetailed" with UHS to provide an insurance package less expensive than that available from other carriers.

These facts are not sufficient to show how the clinic fee or insurance mandate unreasonably restrained trade or harmed the competitive process. Plaintiffs have not pled any facts suggesting that URI or LINA coerced students into buying the LINA plan, or that they sought to unfairly exclude competitors from insuring URI students. Rather, URI allowed students to choose between LINA or "comparable" coverage plans. This policy, plaintiffs acknowledge, resulted in a majority of URI students opting for non-LINA policies. Amended Complaint at ¶ 144 ("Thousands of URI students have non LINA/URI health insurance"); Plaintiffs' Abbreviated Memorandum at 28 n. 74, 32–33 (approximately 40% of URI students bought LINA insurance).

Moreover, simply because certain insurance plans were not deemed "comparable" is not enough evidence, *standing alone*, to suggest significant anticompetitive effects. *See, e.g., Reazin v. Blue Cross and Blue Shield,* 899 F.2d 951, 960 (10th Cir.), *cert. denied,* 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990) (with rule of reason claim under § 1 of the Sherman Act, "the adverse impact must be on *competition,* not on any individual competitor or on plaintiff's business") (emphasis in original); *Les Shockley Racing, Inc. v. National Hot Rod Ass'n,* 884 F.2d 504, 508 (9th Cir.1989) ("removal of one or a few competitors need not equate with injury to competition" under rule of reason § 1 claim).

In short, plaintiffs have failed to adequately allege in their amended complaint how URI and LINA conspired to unreasonably restrain trade under § 1 of the Sherman Act. There is no need for this Court to determine the existence of a contract, combination or conspiracy, or whether the challenged actions affected interstate commerce.

### 2. Tying Claims Under § 1 of the Sherman Act

■ Plaintiffs' second cluster of antitrust claims are *per se* tying allegations under § 1 of the Sherman Act. A tying arrangement is an agreement by one party to sell a product (the tying product) only on the condition that the buyer purchases a second product (the tied product), or at a minimum, that the buyer agrees that it will not purchase the second product from any other seller. *Eastman Kodak Co. v. Image Technical Services, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2072, 2079, 119 L.Ed.2d 265 (1992); *Northern Pacific Railway Company v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518–19, 2 L.Ed.2d 545 (1958). The Supreme Court has long recognized that "certain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable 'per se'." *Jefferson Parish,* 466 U.S. at 9, 104 S.Ct. at 1556. The caselaw indicates that a *per se* tying violation occurs where: (1) there is a tie of two separate products; (2) the seller has "appreciable" or "sufficient" economic power in the tying product market; and (3) the tie affects a substantial volume of commerce in the tied product market. *See Kodak,* —— U.S. at ——, 112 S.Ct. at 2079; *Jefferson,* 466 U.S. at 16–22, 104 S.Ct. at 1560; *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 498–503, 89 S.Ct. 1252, 1256–58, 22 L.Ed.2d 495 (1969). *See also Grappone, Inc. v. Subaru of New England, Inc.,* 858 F.2d 792, 794 (1st Cir.1988).[4]

---

4. In theory, it is also possible to prove that a tying arrangement violates § 1 of the Sherman Act under the rule of reason. Under the rule of reason—unlike the *per se* test—a plaintiff bringing a tying claim "has the burden of proving that the [challenged action] violated the Sherman Act because it unreasonably restrained competition." *Jefferson Parish,* 466 U.S. at 29, 104 S.Ct. at

Plaintiffs allege three separate tying arrangements. The first arrangement is between a URI education (tying product) and URI's health clinic (tied product). Amended Complaint at ¶¶ 109, 253. The second is between URI's health clinic (tying product) and the LINA insurance (tied product). Amended Complaint at ¶ 149. The third is between a URI education (tying product) and the LINA insurance (tied product). Amended Complaint at ¶ 98.

■ With all due respect to plaintiffs' efforts in this area, I believe their amended complaint fails to state a viable tying claim. To begin, for two of the three alleged tying arrangements—the health clinic and LINA insurance, and URI education and LINA insurance—plaintiffs have simply not alleged sufficient facts to show that an actual tie existed. Plaintiffs do not indicate that URI conditioned a university education or health clinic services on the purchase of LINA insurance. As noted above, students were given a choice of subscribing to the LINA plan or choosing a "comparable" plan.[5]

■ With respect to the remaining alleged arrangement—URI education and the mandatory health clinic fee—most students were obliged to pay the health clinic fee. Nevertheless, I do not believe plaintiffs have adequately alleged that this arrangement involved two separate products. In *Jefferson Parish, supra*, the U.S. Supreme Court stated "that the answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items." 466 U.S. at 19, 104 S.Ct. at 1562. Stated another way, a tying arrangement must "link two distinct markets" where

there is "sufficient demand" for each product. *Id.* at 19–22, 104 S.Ct. at 1562–63. *See also Kodak,* —— U.S. at ——, 112 S.Ct. at 2080.

In the case at hand, plaintiffs have not legitimately alleged that the URI health clinic is part of product market separate from a URI education. They merely argue in their briefs that students go to URI for its academic offerings, not for mandatory clinic coverage. But this conclusory statement does not indicate the existence of a separate market for student clinic services available to URI students.

■ An additional fatal flaw in all three purported tying schemes is plaintiffs' failure to adequately allege significant economic power in a relevant tying market. "Market power is the power 'to force a purchaser to do something that he would not do in a competitive market.'" *Kodak,* —— U.S. at ——, 112 S.Ct. at 2080 (quoting *Jefferson Parish,* 466 U.S. at 14, 104 S.Ct. at 1559). "The existence of such power ordinarily is inferred from the seller's possession of a predominant share of the market." *Id.* —— U.S. at ——, 112 S.Ct. at 2081. Market power may also be shown where a seller offers a unique product that competitors cannot offer—such as a patented product or a special tract of land. *Jefferson Parish,* 466 U.S. at 16–17, 104 S.Ct. at 1560; *Grappone,* 858 F.2d at 796.

Plaintiffs argue that there is sufficient proof of economic power in both of the relevant tying product markets. With respect to the URI education, plaintiffs declare that "URI easily enjoys 'a significant market share' of the higher education business of URI students." Plaintiffs' Abbreviated

---

1567. The First Circuit has interpreted this requirement to mean that a plaintiff cannot show a tying violation in the absence of the *per se* rules unless the *tie's* anticompetitive effects outweigh its legitimate business justifications. *Grappone,* 858 F.2d at 799.

In the current action, plaintiffs do not articulate a rule of reason challenge. Nor do they allege sufficient facts in the amended complaint that point to significant anticompetitive effects in any tied product market. Thus, I conclude that plaintiffs have failed to state a rule of reason tying claim.

5. Plaintiffs argue that the health insurance requirement precludes some students from employing "self-insurance." Abbreviated Memorandum at 24. If students do not wish to purchase any insurance, however, the university's mandate lacks anticompetitive consequences. "[W]hen a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied-product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed." *Jefferson Parish,* 466 U.S. at 16, 104 S.Ct. at 1560. *See also Grappone,* 858 F.2d at 799.

Memorandum at 20. Plaintiffs' market power arguments concerning URI's mandatory health clinic fee are inextricably linked to their URI education market assertions. They state: "Given URI's market power in URI students' education, and that clinic fee risk coverage is tied by it, URI also has market power in said risk coverage." Plaintiffs' Abbreviated Memorandum at 20.

Plaintiffs assert that this market definition is justified because the vast majority of students do not transfer to other schools once they enroll at URI. Several reasons for this low transfer rate, according to plaintiffs, are the trouble and expense for a URI student to transfer to another school, problems transferring URI academic credits to another university, a student's aversion to leaving family or friends, and the higher tuition and costs at other universities. Plaintiff's Original Memorandum at 160–61. In essence, plaintiffs assert that students become "locked-in" to a URI education once they enroll, even if the university does not possess significant economic power over prospective students before they first matriculate.[6] Plaintiffs' Original Memorandum at 161–63. This "lock-in" provides URI with market power over the continued education of its students.

Last year, the U.S. Supreme Court provided support for this line of argument in *Eastman Kodak, supra.* In *Kodak,* independent service organizations brought an antitrust action under § 1 and § 2 of the Sherman Act challenging Eastman Kodak's policy of restricting the availability of spare parts for its photocopier and micrographic equipment to only those customers who serviced their own machines or hired Kodak service. —— U.S. at ———–———, 112 S.Ct. at 2076–77. The Ninth Circuit determined that Kodak was not entitled to summary judgment on the § 1 tying claims because there was an issue of material fact whether Kodak's economic power in the tying product market (spare parts) restrained competition in the tied product market (service). The Court of Appeals also concluded that summary judgment was inappropriate on the § 2 claims. *Id.* —— U.S. at ———–———, 112 S.Ct. at 2078–79.

Kodak argued in the Supreme Court "that even if it concedes monopoly *share* of the relevant parts market, it cannot actually exercise the necessary market *power* for a Sherman Act violation ... because competition exists in the equipment market [i.e., Kodak and other equipment brands]." *Id.* —— U.S. at ———, 112 S.Ct. at 2081 (emphasis in original). Kodak asked the Court to adopt a legal presumption that equipment competition precludes a finding of monopoly power in the service or parts "aftermarkets." *Id.* —— U.S. at ———, 112 S.Ct. at 2082. The Court rejected this argument in affirming the Ninth Circuit's ruling. In addressing the § 1 tying claims, it held that there was a question of fact over: (1) whether there was sufficient information in the marketplace about the "lifecycle" costs of maintaining this type of equipment at the time of purchase; and (2) the costs of switching from Kodak to another product after purchasing the equipment—that is, whether high switching costs will "lock-in" consumers to Kodak machines.[7] *Id.* —— U.S. at ———, 112 S.Ct. at 2086–87.

Turning back to our case, I do not believe plaintiffs have alleged sufficient facts in their amended complaint to support a market restricted to the higher education business of solely URI students. For one thing, no facts are alleged that the health insurance requirement was a hidden cost. The university has apparently required health insurance since 1968. Thus, the premiums at issue in this case were required beginning in the first semester of a student's enrollment at URI.

---

**6.** Plaintiffs do suggest in passing, however, that "[b]efore the prospective student enrolls at *any* university, URI has market power regarding that prospective student if s/he is not admitted anywhere else or cannot afford to go anywhere else, or, lacks a non-URI option for any other reason." Plaintiff's Original Memorandum at 161 (emphasis in original). Plaintiffs do not expand upon *this highly speculative theory of market power,* and thus I believe it merits no attention from the Court.

**7.** Also critical to the Supreme Court's denial of summary judgement on the § 1 tying claims was evidence "that Kodak's control over the parts market has excluded service competition, boosted service prices and forced unwilling consumption of Kodak service." —— U.S. at ———, 112 S.Ct. at 2081.

Presumably, students who did not want to buy health insurance had enough information at that stage to decide whether to matriculate at URI or choose another school. This easily discoverable information helps distinguish this case from the facts in *Kodak*, where there was a factual question concerning the availability of information about future repair costs when the Kodak equipment was originally purchased.

In addition, plaintiffs do not present any facts in the amended complaint that point to the inability of students to transfer to other schools. There are no facts on the costs of switching schools. There are no facts on transferring URI credits. Nor are there any facts on the comparative costs of public and private schools inside and outside of Rhode Island. Plaintiffs simply rely on conclusory statements in their supporting memoranda to carry the day.

No further analysis of the tying claims is necessary. I need not determine whether plaintiffs have alleged facts sufficient to demonstrate that a substantial volume of commerce in the tied product market was affected.

### 3. *Monopolization Claims Under § 2 of the Sherman Act*

 Plaintiffs' final grouping of antitrust claims fall under § 2 of the Sherman Act, which states that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony ..." 15 U.S.C. § 2. "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident.'" *Kodak*, —— U.S. at ——, 112 S.Ct. at 2089 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)). "Monopoly power is the power to control market prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). *See also Kodak*, —— U.S. at ——, 112 S.Ct. at 2090. In simple terms, the relevant market is composed of (1) the product market and (2) the geographic area involved. *See du Pont* 351 U.S. at 404, 76 S.Ct. at 1012; *Brown Shoe Co. v. United States*, 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). The relevant product market generally consists "of products that have reasonable interchangeability for the purposes for which they are produced," taking into consideration price, use and quality. *du Pont*, 351 U.S. at 404, 76 S.Ct. at 1012. This determination often involves an evaluation of the "cross-elasticity" of demand between products—or "the degree that buyers of one product switch to the other in response to price changes." *H.J., Inc. v. ITT*, 867 F.2d 1531, 1538 (8th Cir.1989).

Plaintiffs' claims here can best be characterized as alleging a conspiracy to monopolize.[8] First, they allege that LINA and URI conspired to monopolize for the URI health clinic "the health care business" of URI students enrolled in the LINA plan. Amended Complaint at ¶ 128. Second, they allege that LINA and URI conspired to monopolize the "health risk coverage of those URI students whose health was *not* already insured else-

---

8. Both plaintiffs and defendants have characterized these § 2 claims as "attempted monopolization" rather than conspiracy to monopolize. In my view, conspiracy to monopolize is a better label because the claims allege a conspiracy between two entities—URI and LINA. In any case, the choice of category is not critical to the outcome. As discussed below, plaintiffs have failed to allege a specific intent to monopolize in the relevant market—an essential element for both attempted monopolization and conspiracy to monopolize. *Compare Spectrum Sports, Inc. v. McQuillan*, —— U.S. ——, ———–——, 113 S.Ct. 884, 890–892, 122 L.Ed.2d 247 (1993) (elements of attempted monopolization) with *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1576 (11th Cir.1991) (elements of conspiracy to monopolize) and *Volvo North America Corp. v. Men's Int'l Professional Tennis Council*, 857 F.2d 55, 74 (2nd Cir.1988) (same). Moreover, conspiracy to monopolize might be viewed as an easier claim to plead than attempted monopolization because the plaintiff need not address the element of a "dangerous probability of success" in the market. ABA, *Antitrust Law Developments* at 272.

where ..." Amended Complaint at ¶¶ 155 and 254 (emphasis in original). In other words, URI and LINA targeted their marketing efforts at those students who were not already covered by an "automatic" source of insurance (e.g., a parent's or spouse's policy) and thus "had to go shopping in order to become insured." Plaintiffs' Abbreviated Memorandum at 30.

■ Courts have articulated three elements of a conspiracy to monopolize: (1) the existence of a combination or conspiracy; (2) an overt act in furtherance of the conspiracy; and (3) specific intent to monopolize. *See Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1576 (11th Cir.1991); *Volvo North America Corp. v. Men's Int'l Professional Tennis Council*, 857 F.2d 55, 74 (2nd Cir. 1988); *Dreiling v. Peugeot Motors of America, Inc.*, 850 F.2d 1373, 1382 (10th Cir.1988). *See also* ABA, *Antitrust Law Developments* at 270 (collecting cases). Assuming plaintiffs have properly alleged the existence of a combination or conspiracy and an overt act, the amended complaint does not allege sufficient facts to show a specific intent to monopolize for either of the § 2 claims. More precisely, neither claim alleges a specific intent to monopolize in a *relevant market.*

■ With respect to the first claim, plaintiffs appear to assert that the relevant market is the type of medical services available at the URI health clinic for LINA-insured students. In support of this market definition, plaintiffs make an incomprehensible declaration: "Obviously there is nothing reasonably interchangeable with the health care available at the URI clinic, as, by their na-

ture, medical services and techniques are highly specialized. For instance, there are no reasonable substitutes for any of the following: x-rays, laboratory tests, gynecological tests, or orthopedic services." Plaintiffs' Original Memorandum at 195.

I recognize that in certain circumstances a single brand of product or service can constitute the relevant market under the Sherman Act. *Kodak,* —— U.S. at ——, 112 S.Ct. at 2090. In the case at bar, however, plaintiffs do not present any facts to show why the relevant market for this § 2 monopolization claim should be limited to URI health clinic services for students enrolled in the LINA plan. Under the facts alleged, students voluntarily chose to subscribe to the LINA–URI health care arrangement—a set-up that provided insurance coverage only if students first visited the URI health clinic. If the LINA–URI option did not appeal to them, they could subscribe to a "comparable" plan with an alternative health care scheme. While the LINA plan was designed to "dovetail" with the URI health clinic services, the amended complaint does not allege sufficient facts to indicate that these "comparable" plans were not "reasonably interchangeable" with LINA either in cost or in quality of health care coverage. Equally significant in light of *Kodak,* students were not "locked-in" to the LINA plan—they could easily switch carriers at the end of the year.

Thus, based upon amended complaint, the relevant market for plaintiffs' first § 2 claim must, at a minimum, include LINA and other "comparable" health care plans available to URI students.[9] In this broader market, plaintiffs have not alleged any facts to indi-

---

9. This position is supported by one pre-*Kodak* U.S. District Court case from New York, *Metropolitan Life Insurance Co. v. Adler*, 1988 WL 13725, 1988 U.S.Dist. LEXIS 1146, 1988–1 Trade Cases ¶ 67,907 (S.D.N.Y.1988). In that case, the defendant, Dr. Adler, brought a § 2 antitrust counterclaim alleging that Metropolitan Life Insurance Company sought to limit any competition that could affect its alleged monopoly of group medical insurance for New York State employees. Specifically, Adler charged that Metropolitan Life attempted to deprive members of the insurance plan of the physician of their choice solely to enhance profits and lower costs. 1988 WL 13725, at *4, 1988 U.S.Dist. LEXIS 1146, at *10. Adler contended

that the relevant market for this monopolization allegation was limited to the employees of New York State covered by the plaintiffs' health insurance plans. *Id.* 1988 WL 13725, at *4, 1988 U.S.Dist. LEXIS 1146, at *11–12.

The Court dismissed the counterclaim. It found, among other things, that Adler had failed to plead an appropriate market definition. The Court wrote: "... Dr. Adler attempts to allege a monopoly simply by definition of the market. Surely the relevant market cannot be those New York State employees who have opted to subscribe to Metropolitan's health insurance. In such a case, there could be no finding other than one of monopoly." *Id.* 1988 WL 13725, at *4, 1988 U.S.Dist. LEXIS 1146, at *12.

cate a specific intent to monopolize. Indeed, as noted, URI's program enabled the majority of URI students to enroll in non-LINA plans.

Focusing on the second monopolization allegation, plaintiffs suggest that the relevant market is limited to health insurance available to those students "whose health was not already insured elsewhere." This is another attempt by plaintiffs to bootstrap an antitrust claim to a narrowly drawn market. But this market definition makes no sense. This subset of students—if this group can be delineated at all—was equally free to choose or reject LINA. Plaintiffs have not proffered any facts to indicate that these students were somehow forced into buying the LINA plan, or that they faced different options than other URI students choosing among insurance carriers. Thus, the relevant market for this claim must also be broader than defined by plaintiffs—encompassing at least LINA and "comparable" insurance plans. And, once again, there are no facts alleged to show a specific intent to monopolize this type of market.

In sum, none of the federal antitrust allegations state a valid claim. All of these claims are dismissed.

### B. *Equal Protection Claims*

I now examine plaintiffs' federal equal protection claims under the Fourteenth Amendment (Count IX). The gravamen of these claims is that URI and LINA intentionally charged male students the same amount in health clinic fees and insurance premiums as female students, even though a portion of these costs were exclusively spent on medical services for women (e.g., gynecological care). This structure, plaintiffs assert, discriminated against male students on the basis of sex and denied them the equal protection of the law.

The Equal Protection Clause of the Fourteenth Amendment declares that no State shall "deny to any person within its jurisdiction the equal protection of the laws." This constitutional command "is essentially a direction that all persons similarly situated should be treated alike." *Cleburne v. Cle-*

*burne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Even assuming the operations of URI and LINA constituted state-action for purposes of the Fourteenth Amendment, plaintiffs' equal protection claims are meritless.

It is now a bedrock principle that to prove an equal protection claim, a plaintiff must demonstrate that the defendant acted with discriminatory intent or purpose. *See Washington v. Davis,* 426 U.S. 229, 239–42, 96 S.Ct. 2040, 2047–48, 48 L.Ed.2d 597 (1976); *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 896 (1st Cir.1988). And " '[d]iscriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (citation omitted). *See also McCleskey v. Kemp,* 481 U.S. 279, 298, 107 S.Ct. 1756, 1770, 95 L.Ed.2d 262 (1987).

In this case, plaintiffs have not pled any facts to indicate that URI or LINA intentionally discriminated against male students in the imposition of the clinic fees or insurance premiums. Plaintiffs simply complain that URI and LINA were cognizant that a portion of these costs were funneled into women's health services. Indulging all reasonable inferences in favor of plaintiffs, I do not see how this naked allegation states a claim under the Equal Protection clause. As the First Circuit has recently stated:

> To survive a motion to dismiss, an equal protection claim "must 'outline facts sufficient to convey specific instances of unlawful discrimination.' " A plaintiff "may not prevail simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by a discriminatory animus." *Coyne v. City of Somerville,* 972 F.2d 440, 444 (1st Cir.1992) (citations omitted).

In conclusion, without sufficient facts to indicate discriminatory intent or purpose,

plaintiffs' federal equal protection claims must be dismissed.

### C. *Due Process Claims*

Plaintiffs also plead separate claims under the Due Process Clause of the Fourteenth Amendment (Count XII). They assert that URI's mandatory clinic fee and insurance requirement deprive students of liberty "to contract" and "of property." Plaintiffs are particularly troubled by URI's policy of automatically billing for LINA if a student did not pick another insurance carrier, and of URI's policy of prohibiting registration if students did not pay their LINA bill.

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." Plaintiffs appear to allege a substantive due process violation based upon the right or liberty to contract. They ground this argument on language contained in the 1923 Supreme Court case, *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923):

> While this court has not attempted to define with exactness the liberty ... guaranteed [by the Fourteenth Amendment], the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the *right of the individual to contract*, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men. (emphasis added).

While these are majestic words, since the 1930s the Supreme Court has severely curtailed substantive due process theories based on economic assertions and the right to contract. *See Ferguson v. Skrupa*, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963) (upholding Kansas statute making it a misdemeanor to engage in business of debt adjustment except as incident to practice of law); *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937) (upholding Washington State statute establishing minimum wages for women); *Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934) (upholding New York Milk Board's order fixing milk prices for distributors and storekeepers). *See also Tenoco Oil Co. v. Department of Consumer Affairs*, 876 F.2d 1013, 1021 (1st Cir.1989) ("Since 1937, when 'substantive' due process lost favor, courts have reviewed economic legislation with great deference to the legislature's policies ..."). "It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). *See also Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, —— U.S. ——, ——, 113 S.Ct. 2264, 2287, 124 L.Ed.2d 539 (1993).

Even assuming URI is a state actor, and assuming further that the factual setting in this case implicates the right to contract, plaintiffs' amended complaint still fails to state a valid substantive due process claim. Plaintiffs fail to allege any facts that URI or LINA acted in an arbitrary or irrational manner. Nor do they cite any specific authority to support their broad assertions of constitutional harm. Simply put, under the broadest reading of the amended complaint, plaintiffs' disfavored economic due process allegations must be dismissed.

### IV. *Conclusion*

In sum, I dismiss with prejudice plaintiffs' federal antitrust, equal protection and due process claims. In the absence of any federal claims, this case lacks original jurisdiction in this Court. Within my discretion, I respectfully decline to exercise supplemental jurisdiction over the remaining state claims. *See* 28 U.S.C. § 1367(c)(3). I wish to emphasize that this ruling in no way reflects on the

merits of those state claims. All state law claims are dismissed *without* prejudice.

SO ORDERED.