**EASTERN FOOD SERVICES, INC., Plaintiff,**

v.

**PONTIFICAL CATHOLIC UNIVERSITY OF PUERTO RICO SERVICE ASSOCIATION, INC., and Coca Cola Puerto Rico Bottlers, Inc., Defendants.**

**Civil No. 99-1929 (JAG).**

United States District Court, D. Puerto Rico.

Aug. 30, 2002.

Pedro Jimenez–Rodriguez, Correa, Collazo, Herrero, Jimenez & Fortuno, San Juan, PR, for Plaintiff.

Jose H. Vivas, Vivas & Vivas, Ponce, PR, Nestor Mendez–Gomez, Pietrantoni Mendez & Alvarez, Orlando H. Martinez–Echeverria, San Juan, PR, for Defendants.

Nestor Medez–Gomez, Pietrantoni Mendez & Alvarez, San Juan, PR, for plaintiff.

Jose H. Vivas, Vivas & Vivas, Ponce, PR, for defendants.

## OPINION AND ORDER

GARCIA–GREGORY, District Judge.[1]

On November 1, 1999, defendant Coca Cola Puerto Rico Bottlers, Inc. ("Coca Cola"), pursuant to Fed.R.Civ.P 12(b)(6), moved for dismissal of plaintiff Eastern Food Services, Inc.'s ("EFS"), claims of anti-competitive practices pursuant to the Sherman Anti–Trust Act, 15 U.S.C. § 1, the Clayton Act, 15 U.S.C. § 13(c),[2] and supplemental state law claims (Docket No. 14). On January 21, 2000, defendant Pontifical Catholic University of Puerto Rico Services Association ("PCUSA") joined Coca Cola's motion to dismiss (Docket No. 35). On January 26, 2000, EFS opposed (Docket No. 37). For the reasons discussed below, defendants' motion to dismiss is GRANTED.

### FACTUAL BACKGROUND[3]

In late 1996, EFS was approached by Pepsico Puerto Rico, Inc. ("Pepsi") regarding the possibility that EFS would assume Pepsi's rights and obligations under a contract between Pepsi and PCUSA, for the distribution, sale, and dispensing of food and beverage products within the University's campus. EFS and PCUSA entered into negotiations, which continued into early 1997. Subsequently, on or about June 27, 1997, EFS and PCUSA executed a contract, effective June 1, 1997, whereby EFS became the exclusive commercial food and beverage concessionaire of the University. EFS would conduct its business through the operation of the University's cafeteria, as well as in various then

---

1. Alejandro J. Cepeda–Díaz, a third year student at the University of Puerto Rico School of Law, assisted in the research and preparation of this opinion.

2. On May 22, 2000, plaintiff moved for voluntary dismissal of its Clayton Act claims in light of the First Circuit's decision in *Bridges*

*v. MacLean–Stevens Studios, Inc.*, 201 F.3d 6 (1st Cir.2000) (Docket No. 50). The court need not discuss these claims inasmuch as the motion was granted and partial judgment entered (Docket Nos. 52 and 53).

3. The relevant facts are taken from the Complaint (Docket No. 1)

existing and projected points-of-sale throughout the campus. Furthermore, EFS would have the exclusive right to select the products to be sold through vending machines and to set their prices. EFS considered arrangements with Coca Cola for the operation of the vending machines, but after careful consideration, opted instead to subcontract with Pepsi and Santaella Distributors.

The contract conferred upon EFS exclusive rights for an initial three-year period, until July 31, 2000, with an additional two-year renewal option exercisable by EFS with pre-set rent rates for the renewal period. The contract could be terminated by PCUSA upon a default by EFS not cured within thirty days, or by EFS giving notice at least ninety days before the end of an academic year.

Under the contract, EFS would pay PCUSA ten yearly installments, initially in the amount of $4,100, in addition to fifty percent of the profits received from vending machine sales and a bi-yearly donation of $3,000 to the University. Furthermore, separate electrical power and water meters would be set-up for the cafeteria and the various points-of-sale and EFS would be responsible for payment of these utility services. Based on its business analysis and objective projections, EFS made an initial investment in excess of $250,000 in connection with the contract.

Subsequently, EFS noticed that, instead of being billed directly by the utility companies for electrical power and water services, it was being billed by the University at significantly higher rates than EFS paid at analogous sites. EFS complained to PCUSA, and as a result, the parties held ongoing talks as to whether and how EFS would be billed for these services.

In mid–1998, PCUSA instructed EFS to build a food and beverage dispensing kiosk in the University campus. Although EFS was not under any contractual obligation to build the kiosk and also asserts that the kiosk was not necessary, EFS, in good faith, followed PCUSA's instructions and built the kiosk at a cost in excess of $20,000. EFS requested that it be given a ten-year concession as consideration for its investment, or that it be reimbursed for the costs of the kiosk. PCUSA never responded to EFS's request.

In the summer of 1998, PCUSA approached EFS to recruit its assistance in obtaining a donation in the approximate amount of $284,000 for the construction of an athletic track in the University campus. EFS was asked to persuade Pepsi to make such a donation and held initial discussions with representatives from Pepsi. Pepsi eventually declined to make the donation. EFS then approached Coca Cola in an attempt to persuade it to make the donation.

In August of 1998, when it noticed Coca Cola vending machines being placed throughout the campus, EFS learned that Coca Cola had approached PCUSA directly and independently and had reached an arrangement with PCUSA for a donation of an undisclosed amount. The arrangement allowed Coca Cola to place its vending machines throughout the University campus. Moreover, PCUSA would require that EFS remove all competing vending machines from the campus.

EFS immediately complained to PCUSA. PCUSA responded that its primary goal was not to lose the Coca Cola donation and ordered the removal of all vending machines competing with Coca Cola from the campus. Furthermore, PCUSA offered to consider a financial arrangement to compensate EFS for the impact of Coca Cola's incursion into the campus once competing vending machines had been removed.

PCUSA suggested that it would stop billing EFS for electrical power and water

services—a subject still under discussion—in an effort to mitigate the immediate impact of Coca Cola's incursion. In the meantime, the parties would try to negotiate an amendment to the contract where, in exchange for a new financial arrangement, EFS would waive its exclusive vending rights. EFS reluctantly accepted the temporary arrangement. Coca Cola aggressively installed its machines throughout the campus while negotiations took place, specifically targeting EFS's cafeteria and the kiosk, thus impairing EFS's revenues.

As negotiations continued, PCUSA offered to reduce EFS's monthly rent by $200. EFS rejected the offer and the rebate was never implemented. In the following months, PCUSA forwarded to EFS several draft proposals offering an exemption from paying water and electricity in exchange for EFS's waiver of its contractual rights which EFS rejected. In May and June 1999, EFS made several counter-proposals which were summarily rejected by PCUSA. Subsequently, PCUSA unilaterally terminated EFS's contract alleging overdue rent payments in the amount of $4,303.77,[4] and without giving thirty-days notice as required by the contract. On July 28, 1999, EFS paid the amount under protest and formally informed PCUSA of its breach of contract. By letter dated August 5, 1999, PCUSA insisted on terminating the contract, notwithstanding its debts to EFS. PCUSA gave EFS two days to vacate the premises. EFS was in the process of removing its equipment from the premises when, on August 9, 1999, it received a letter from PCUSA reversing its decision to terminate the contract if EFS accepted Coca Cola's presence in the campus.

EFS responded that it was willing to continue with its contractual obligations if

PCUSA also complied with its obligations and recognized EFS's exclusivity and reimbursed EFS for the cost of the kiosk. PCUSA refused to allow EFS's vending machines back into the campus. By letter dated August 18, 1999, EFS notified PCUSA that it was rescinding the contract and pursuing judicial action. That same day, this action was filed.

## DISCUSSION ·

### A. Motion to Dismiss Standard.

Pursuant to Fed.R.Civ.P. Rule 12(b)(6), a complaint may not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *See Brown v. Hot, Sexy and Safer Prods., Inc.*, 68 F.3d 525, 530 (1st Cir.1995). The Court accepts all well-pleaded factual allegations as true, and draws all reasonable inferences in plaintiff's favor. *See Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 51 (1st Cir.1990). The Court need not credit, however, "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like" when evaluating the Complaint's allegations. *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir.1996). When opposing a Rule 12(b)(6) motion, "a plaintiff cannot expect a trial court to do his homework for him." *McCoy v. Massachusetts Institute of Tech.*, 950 F.2d 13, 22 (1st Cir.1991). Plaintiff is responsible for putting its best foot forward in an effort to present a legal theory that will support its claim. *Id.*, at 23 (*citing Correa–Martinez*, 903 F.2d at 52). Plaintiff must set forth "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable theory." *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir.1988).

---

4. EFS asserts that it began withholding rent payments inasmuch as it was owed an excess of $40,000 by PCUSA for several events it catered for the University.

**B.** *Sherman Anti–Trust Act Claims.*

EFS alleges two causes of action under the Sherman Act. First, EFS alleges that a conspiracy occurred between Coca Cola and PCUSA to eliminate competition through unfair business practices. Furthermore, EFS alleges that defendants' actions amount to a concerted refusal to deal. We find that EFS's arguments fail to validly state a claim under the Sherman Act because it has failed to plead facts showing a valid relevant market for antitrust purposes.[5]

■■■ According to § 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is . . . illegal." 15 U.S.C. § 1. In order to survive defendants' motion to dismiss, EFS must allege with sufficient clarity "(1) the existence of a contract, combination or conspiracy among two or more separate entities that (2) unreasonably restrains trade and (3) affects interstate or foreign commerce." *Norte Car Corp. v. First-Bank Corp.*, 25 F.Supp.2d 9, 16 (D.P.R. 1998); *see also Standard Oil Co. v. U.S.*, 221 U.S. 1, 52, 31 S.Ct. 502, 55 L.Ed. 619 (1911). "The intent to do harm to competition, not just to a competitor, must be pleaded and demonstrated." *Norte Car Corp.*, 25 F.Supp.2d at 17 (*citing Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985)).

■■■ Furthermore, to properly plead a restraint of trade, the complaint must also define the relevant market. *See Villalobos v. García Llorens*, 193 F.Supp.2d 401, 405 (D.P.R.2002). The relevant market is composed of two elements: a product market and a geographic market. *See Coastal Fuels of Puerto Rico v. Caribbean Petroleum*, 79 F.3d 182, 197 & n. 11 (1st Cir. 1996); *H.J., Inc. v. Int'l Tel. & Tel. Corp.*, 867 F.2d 1531, 1537 (8th Cir.1989).

■■■ "The relevant product market generally consists 'of products that have reasonable interchangeability for the purposes for which they are produced,' taking into consideration price, use and quality." *Lee v. Life Ins. Co. of North America*, 829 F.Supp. 529, 539 (D.R.I.1993) (*quoting U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)). The first flaw in EFS's allegations is that it fails to properly identify the product it purports to sell in the market. EFS's allegations stem from the fact that it can no longer place its vending machines inside the University campus.[6] A vending machine, in this context,[7] cannot be considered a product. It is, in fact, a point-of-sale; it is where other products are sold. Therefore, absent a product, EFS has failed to establish a valid relevant product market.

Moreover, the relevant geographic market is the area in which sellers of the relevant product compete and in which buyers can practicably turn for alternate sources of supply. *Coastal Fuels*, 79 F.3d at 196. The geographic market must correspond to the commercial reality of the industry and must be economically signifi-

---

**5.** Plaintiff may have adequately pleaded a breach of contract or tortious interference claim, but this is insufficient to spell out a valid federal antitrust claim within the Court's jurisdiction of "[a]ny civil action or proceeding arising under any Act of Congress . . . protecting trade and commerce against restraints and monopolies." 28 U.S.C. § 1337(a).

**6.** It should be noted that EFS was still able to sell its beverage products within the University campus through its other operations.

**7.** A vending machine could be considered a product when it is the object of the transaction and not, as in this case, where it is a venue where other transactions will be conducted.

cant. *See Brown Shoe Co. v. U.S.*, 370 U.S. 294, 336, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). EFS proffers as a geographic market the University campus. "Courts", however, "have generally not accepted geographic market definitions that are unrealistically narrow." *Villalobos*, 193 F.Supp.2d at 405. We find EFS's description of a geographic market to be extremely narrow inasmuch as we do not consider the University campus to be large enough so as to constitute an economically significant area of commerce. Therefore, EFS also fails to establish a relevant geographic market.

Accordingly, insofar as EFS has failed to adequately plead a valid relevant market, its anti-trust claims under the Sherman Act must be dismissed. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3rd Cir.1997).

C. *EFS's Supplemental Claims.*

EFS's supplemental state claims are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3), inasmuch as no federal claims to ground jurisdiction remain in this case.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is GRANTED. EFS's claims under the Sherman Act are hereby dismissed. EFS's supplemental claims are dismissed without prejudice. Judgment shall be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 30th day of August 2002.