**Kirk DAHL, et al., Individually and on Behalf of All Others Similarly Situated, Plaintiffs**

v.

**BAIN CAPITAL PARTNERS, LLC, et al., Defendants.**

Civil Action No. 07–12388–EFH.

United States District Court, D. Massachusetts.

March 13, 2013.

Order Denying Reconsideration in Part June 20, 2013.

Charles N. Nauen, Karen H. Riebel, Richard A. Lockridge, W. Joseph Bruckner, Lockridge Grindal Nauen P.L.L.P., Damien Riehl, George D. Carroll, K. Craig Wildfang, Stacey Slaughter, Thomas B. Hatch, Thomas J. Undlin, Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, MN, George C. Aguilar, Brian J. Robbins, Robbins Arroyo LLP, Hal Cunningham, Walter W. Noss, Kristen M. Anderson, Christopher M. Burke, Scott & Scott LLP, Phong L. Tran, David W. Mitchell, Rob-

bins Geller Rudman & Dowd LLP, Elisabeth A. Bowman, Coughlin Stoia Geller Rudman & Robbins, San Diego, CA, J. Gerard Stranch, IV, Michael Gilman Stewart, Branstetter, Stranch & Jennings, PLLC, Nashville, TN, Jack Landskroner, Paul Grieco, Landskroner Grieco Madden, Ltd., Cleveland, OH, Jayne A. Goldstein, Shepherd, Finkelman, Miller & Shah, LLP, Weston, FL, Mark Reinhardt, Roberta A. Yard, Reinhardt Wendorf & Blanchfield, St. Paul, MN, Tyler W. Hudson, Wagstaff & Cartmell LLP, Kansas City, MO, David R. Scott, Scott & Scott LLP, Colchester, CT, Lisa A. Furnald, Robins, Kaplan, Miller & Ciresi L.L.P., Boston, MA, Max Schwartz, Scott Scott LLP, New York, NY, Patrick J. Coughlin, Susan G. Taylor, Robbins Geller Rudman & Dowd LLP, San Francisco, CA, Randi D. Bandman, Robbins Geller Rudman & Dowd LLP, Boca Raton, FL, for Plaintiffs.

Abram J. Ellis, David T. Shogren, Diana C. Wielocha, Hillary C. Mintz, Jonathan D. Porter, Peter C. Thomas, Simpson Thacher & Bartlett LLP, Alexis K. Brown–Reilly, Daniel E. Antalics, James C. Egan, Jr., Jeffrey L. White, John E. Scribner, Steven A. Newborn, Brianne L. Kucerik, Carrie M. Anderson, Richard R. Cook, Weil, Gotshal & Manges LLP, Barbara H. Wootton, Kelly C. Smith, Michael A. Rubin, Seth J. Wiener, Franklin R. Liss, John A. Freedman, Sarah A. Friedman, William J. Baer, Arnold & Porter LLP, Alexander Maltas, Jennifer L. Giordano, Marcellus Williamson, William Sherman, Latham & Watkins, LLP, Ian Simmons, Richard G. Parker, O'Melveny & Myers LLP, Washington, DC, Kevin J. Arquit, Simpson, Thacher & Bartlett LLP, Casey A. Vaughn, Christopher G. Hornig, Darrell S. Cafasso, David M. Sollors, Gandolfo V. Diblasi, Gregory D. Morril, Ian Matthews, Julia M. Guaragna, Kristin L. Keranen, Megan L. Gaffney, Richard C. Pepperman, Stephanie G. Wheeler, Sullivan & Cromwell LLP, Joseph F. Tringali, Paul C. Gluckow, Ryan A. Kane, Simpson Thacher & Bartlett LLP, Daniel M. Segal, Jerome S. Fortinsky, Kenneth M. Kramer, Wayne Dale Collins, Shearman & Sterling LLP, Douglas H. Flaum, Michael B. Deleeuw, Peter S. Guryan, Fried, Frank, Harris, Shriver & Jacobson LLP, Nicole M. Naples, Norman P. Ostrove, Matthew S. Freimuth, Willkie Farr & Gallagher LLP, Wesley R. Powell, Hunton & Williams LLP, Arun S. Subramanian, Susman Godfrey L.L.P., Alan J. Weinschel, Claire L.M. Webb, David R. Fertig, Eric S. Hochstadt, Fiona Schaeffer, Helene D. Jaffe, James W. Quinn, Thomas C. Frongillo, Weil Gotshal & Manges LLP, Kenneth Conboy, Latham & Watkins, Abby F. Rudzin, Jonathan Rosenberg, O'Melveny & Myers, LLP, New York, NY, Kevin M. McGinty, Meredith M. Leary, Robert O. Sheridan, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, John D. Donovan, Jr., Ropes & Gray LLP, James R. Carroll, Kurt Wm. Hemr, Skadden, Arps, Slate, Meagher & Flom LLP, Ian D. Roffman, Jonathan L. Kotlier, Nutter, McClennen & Fish, LLP, Boston, MA, Benjamin R. Walker, Springfield, MA, Dane A. Drobny, Michael P. Mayer, Winston And Strawn LLP, Chicago, IL, Anne Mullins, Erica W. Harris, Karen A. Oshman, Mary Kathryn Sammons, H. Lee Godfrey, Harry P. Susman, Susman Godfrey LLP, Houston, TX, for Defendants.

**MEMORANDUM AND ORDER**

EDWARD F. HARRINGTON, Senior District Judge.

This matter comes before the Court on thirteen motions for summary judgment. The motions consist of one omnibus motion for summary judgment as to Count One of the Fifth Amended Complaint filed jointly by the Defendants, one motion for sum-

mary judgment as to Count Two filed by the Defendants named in that Count,[1] and eleven separate motions for summary judgment filed by each Defendant individually as to both counts.

## I. Background. The Claims.

The Plaintiffs are former shareholders of a number of large public companies that were subject to leverage buyout transactions (the "LBOs")[2] between 2003 and 2007. The Defendants are financial firms which were involved with those transactions. The Defendants include ten large private equity firms, including Apollo Global Management LLC ("Apollo"), Bain Capital Partners, LLC ("Bain"), The Blackstone Group L.P. ("Blackstone"), The Carlyle Group, LLC ("Carlyle"), Goldman Sachs Group, Inc. ("Goldman Sachs" or "Goldman")[3], Kohlberg Kravis Roberts & Company, L.P. ("KKR"), Providence Equity Partners, Inc. ("Providence")[4], Silver Lake Technology Management, L.L.C. ("Silver Lake")[5], TPG Capital L.P. ("TPG"), Thomas H. Lee Partners, L.P. ("THL"). These firms are in the business of purchasing publicly-traded companies. The eleventh Defendant, JP Morgan Chase and Co. ("JP Morgan"), is not a private equity firm but provided financing and advice for some of the transactions at issue.

The Plaintiffs bring two claims pursuant to the Sherman Act, 15 U.S.C. § 1, on behalf of themselves and others similarly situated, alleging that the Defendants illegally colluded to artificially fix the sales prices of the companies in which Plaintiffs held securities. Plaintiffs contend that they were, in turn, deprived of the true value of their stock.

Count One of the Fifth Amended Complaint alleges that "[b]eginning as early as mid–2003 and continuing until 2007 ... Defendants and their co-conspirators engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate the market for and artificially fix, maintain, or stabilize prices of securities in club LBOs in violation of § 1 of the Sherman Act, 15 U.S.C. § 1." The Fifth Amended Complaint describes Count One as a single "overarching conspiracy" which resulted in "suppressed competition in 19 of the largest LBOs—and 8 related transactions—that closed between 2003 and 2007."

The transactions at issue in Count One concerned the following companies (the "Target Companies"): (1) PanAmSat; (2) AMC; (3) SunGard; (4) Neiman Marcus;

1. The Defendants named in Count Two are Bain, Blackstone, Carlyle, Goldman Sachs, KKR, and TPG. Bain and KKR have been released.

2. The Fifth Amended Complaint states that: An LBO is a type of transaction in which a purchaser, often a private equity firm, acquires substantially all of a company's outstanding shares using some of its own capital along with a substantial amount of debt financing. The purchaser then typically takes the company private (by withdrawing its shares from the public exchange), operates it for a period of time, and sells it or conducts a public offering for its shares.

3. Defendant Goldman Sachs provided financial advice and financing for certain transactions in addition to having a separate private equity division which was involved in the purchase of some of the Target Companies.

4. Defendant Providence was limited to investing in the telecommunications, media and technology industries and was only involved in the purchase of companies in those industries.

5. Defendant Silver Lake was bound by its Limited Partnership Agreements to invest only in technology and technology-related growth industries and was only involved in the purchase of the Target Companies in those industries.

(5) Michaels Stores; (6) Aramark; (7) Kinder Morgan; (8) HCA; (9) Freescale; (10) Toys 'R' Us; (11) Texas Genco; (12) Education Management; (13) Univision; (14) Harrah's; (15) Clear Channel; (16) Sabre; (17) Biomet; (18) TXU; (19) Alltel; (20) Philips/NXP; (21) Loews; (22) Vivendi; (23) Community Health Systems; (24) Nalco; (25) Cablecom; (26) Susquehanna; and (27) Warner Music.

Of the twenty-seven transactions, nineteen were LBOs, six were non-LBOs, and two were never consummated. Of the nineteen LBOs, Plaintiffs have standing to seek damages for seventeen under Count One. The remaining ten transactions are alleged to be relevant to and illustrative of the overarching conspiracy pled in Count One.

Count Two (referred to as "Count Two" or the "HCA Claim") alleges a conspiracy involving certain Defendants to rig bids and not to compete with respect to the leverage buyout transaction of HCA, one of the Target Companies.

*The Alleged Overarching Conspiracy.*

Plaintiffs contend that the evidence supports a finding of an overarching conspiracy on the part of the Defendants to allocate the market for large LBOs. They contend that the evidence establishes a motive on the part of the Defendants to conspire, an opportunity to do so, and actions in furtherance of the overarching conspiracy, including the establishment of rules of conduct. They further assert that the economic evidence supports a finding of an overarching conspiracy.

Plaintiffs assert that the alleged overarching conspiracy was in effect by 2003. At that time, the private equity industry had entered an era of "mega-fund" investment, making the buyout of "mega-cap" targets—large multi-billion dollar companies—possible for a limited number of private equity firms who could garner sufficient funds to compete for the transactions.

Plaintiffs assert that the late 1980s marked the last time the market conditions in the industry were as fertile. During that time, the then—largest private equity firm, Defendant KKR, conducted a $31 billion LBO of RJR Nabisco. Leading up to the RJR Nabisco transaction, a bidding war between potential purchasers erupted, causing the price to rise substantially.

The transactions at issue were all "mega-cap" transactions and the Defendants, who are some of the largest private equity firms in the world, constituted a portion of the limited pool of potential participants in those transactions. Plaintiffs contend that Defendants understood that the large amounts of capital and access to cheap debt could create an RJR Nabisco-like bidding war for other large LBOs, where billions of dollars of capital could be deployed to muscle out competition. Plaintiffs contend that Defendants understood that, by working together, they could suppress competition and avoid another price escalation.

*The Transactions.*

The evidence shows that the twenty-seven transactions were initiated by the boards of directors of the Target Companies either on their own determination or in response to an inquiry. When a potential sale was deemed desirable, the board of directors would often hire a financial advisor, such as JP Morgan or Goldman Sachs, to administer the process. While the details of the sales process for each transaction was set by each Target Company's board of directors and financial advisors, they generally took two different forms.

The first form was an auction, in which a Target Company would announce that it

was for sale and solicit bids pursuant to particular rules set up for the auction. The second form was a proprietary deal, in which the Target Company would either deal with one buyer or a consortium of buyers and sign an agreement for sale. The signed agreement would then be announced to the public and the Target Company would have a period of time between the announcement of the signed agreement and its formal closing to find a better offer. During this "go-shop" period, the Target Company's financial advisor "proactively goes out to buyers, and also responds to all inquiries that are received, and tries to stimulate the interest and to create a higher bid for the company."

Plaintiffs contend that the alleged conspiracy was in operation from the 2003 Nalco transaction until the 2007 Alltel transaction, affecting every transaction for the Target Companies in the interim. The evidence of the Defendants' conduct during those four years shows a kaleidoscope of interactions among an ever-rotating, overlapping cast of Defendants as they considered acquiring, attempted to acquire, or successfully acquired the Target Companies.

Plaintiffs assert that the evidence shows a pattern of conduct on the part of the Defendants evidencing the alleged overarching conspiracy. They contend that Defendants employed certain practices or rules to effectuate the alleged overarching conspiracy and that these rules were referred to as "club etiquette" and "professional courtesy" within the industry.

Plaintiffs assert the rules to be as follows: First, Defendants formed bidding clubs or consortiums, whereby they would band together to put forth a single bid for a Target Company. The Plaintiffs assert that the purpose of these bidding clubs was to reduce the already limited number of private equity firms who could compete and to allow multiple Defendants to participate in one deal, thereby ensuring that every Defendant got a "piece of the action." Second, Defendants monitored and enforced their conspiracy through "quid pro quos" (or the exchange of deals) and, in the instances where rules were broken, threatening retaliatory action such as mounting competition against the offending conspirator's deals. Third, to the extent the Target Company set up an auction, Defendants did their best to manipulate the outcome by agreeing, for example, to give a piece of the company to the losing bidders. Fourth, Defendants refused to "jump" (or compete for) each other's proprietary deals during the "go shop" period. This gave Defendants the comfort to know they could negotiate their acquisitions without the risk of competitive bidding.

*Bidding clubs.*

Working together to jointly purchase the Target Companies was a common practice in the industry. Transactions resulting from these consortiums were often referred to as "club deals." Each of the twenty-seven transactions for the Target Companies was such a "club deal," in which at least one consortium was formed. In almost all of the transactions, multiple consortiums of Defendants (some including non-defendants) were formed.

While certain Defendants worked more often with other Defendants, the consortiums, as viewed across all the transactions, generally consisted of different groups of Defendants. In some cases, certain Defendants that would work together in one transaction, would be in opposing consortiums in other transactions. No single defendant was involved in every transaction.

The evidence shows that Defendants viewed "club deals" and the formation of

consortiums as having certain potential drawbacks, including governance confusion, lack of focus and accountability, and a "group think" mentality, in which conventional wisdom was never challenged. The evidence shows, however, that Defendants believed that working together also provided many benefits, including the ability to complete larger transactions, share expertise, minimize costs, and diversify risk.

Another benefit articulated by the Defendants was the reduction of competition. In many instances, the Defendants' executives observed that less competition was a beneficial effect of forming consortiums, especially in larger transactions where the competition was already limited.[6] The evidence shows that in some transactions certain Defendants invited other Defendants into a consortium in order to remove them from the field of potential competitors.[7] Other correspondence suggest mutual agreements to join forces on a given deal for the purpose of not driving up the price of the stock.[8] Certain Defendants also used the threat of competition to leverage their way into an established consortium.[9] Plaintiffs assert that the evidence shows that Defendants had the ability to finance many of the deals on their own, but instead chose to form consortiums as a way to limit competition.

*Quid pro quos.*

Plaintiffs further assert that the Defendants made "quid pro quo" arrangements, exchanging lucrative deals in an effort to limit competition. They cite to statements

---

6. For instance, a KKR executive observed that the SunGard LBO was a "good deal" because "there was no competition." Providence characterized SunGard as not "a large competitive auction" and stated that "[t]here was actually less competition in [SunGard] than in most smaller deals." A KKR executive stated, in reference to the SunGard transaction, that "the large PE universe was all working together," and "there was no competition."

7. For example, in referring to the Toys 'R' Us transaction, a KKR executive stated that "[g]iven the increased size of the transaction, and our desire to effectively eliminate a competitor from the auction process, we decided to partner with Bain and Vornando." Likewise, during the Freescale transaction, Blackstone executives wanted TPG to join their consortium in order to "mitigate the risk of competition." Similarly, during the Michaels Stores transaction, KKR believed that Carlyle would be "very aggressive" and considered inviting Carlyle into its group (with TPG and Apollo) as a "defensive measure" to mute any potential bid from Carlyle. In an internal email, Carlyle executives indicated that partnering with Permira, a private equity firm that is not a defendant, would "keep [the] only other knowledgeable party on [the] company out of competition."

8. A Goldman executive testified, in reference to exclusivity agreements signed by other Defendants during the Kinder Morgan transaction, that:

> [I]t was my belief at this time that we had agreements that they either would work with us or they would not compete against us ... so it would not bode very well for them to try to read the fine print of a document saying, well, we still could do this, even though we agreed we wouldn't do that.

A Blackstone executive wrote about Texas Genco that Blackstone's message to TPG and KKR is that it was "better for everyone to join forces and have a much higher chance of winning the deal and not drive the price up."

9. During the Texas Genco transaction, Blackstone planned follow-up calls with KKR and TPG to deliver the message that if Blackstone is not made part of the TPG/KKR consortium Blackstone can and will compete. During the Sungard transaction, a Blackstone memorandum stated that "[a]s a result of the threat of our competing offer, the Silver Lake consortium invited BCP [Blackstone Capital Partners]/TPG team to join its group." During the Biomet transaction, Warburg Pincus, a private equity firm that is not a defendant, along with the other consortium members, decided to include Goldman, to ensure that Goldman did not "disrupt [the] process."

between Defendants in which one Defendant believed the other owed it a deal or had an expectation of reciprocation. The record is rife with instances of Defendants seeking to exchange participation in each other's deals. The Plaintiffs assert that this evidence shows that the Defendants monitored and enforced "at bat[s]" to ensure that each Defendant was properly rewarded for its participation in the alleged overarching conspiracy.

The evidence, however, indicates that these "quid pro quo" arrangements were generally made on a one-on-one basis and were predicated on prior working relationships. If a Defendant had worked successfully with another Defendant on a prior deal, they would generally expect to be invited into a subsequent deal.[10]

Many of the Defendants' executives also knew each other personally and corresponded informally. Contemporaneous emails and other documents created during the transactions at issue show that executives of the Defendants appeared at the same events, communicated directly with one another, and referred to each other by nicknames. The evidence also shows that these executives invested in each other's funds and worked together as they moved from firm to firm over the

years. In 2006, some of the executives of different Defendants formed the Private Equity Council, "to promote and protect the interests of the private equity industry and its investors."

*Conduct during auctions.*

Plaintiffs contend that the Defendants manipulated auctions by ignoring binding nondisclosure agreements and by secretly communicating price information to predetermined auction winners, who then offered the losers the opportunity to participate in the final deal.

The record contains a few communications indicating that certain Defendants did not want to disclose to the Target Company that they had discussed joint bidding.[11] The record also contains a few instances of certain Defendants agreeing to bid separately and then potentially coming together in later bidding rounds.[12] The record, however, does not support the allegation that Defendants were sharing price information or had predetermined winners. In fact, there are many instances of contemporaneous communications on the record indicating that Defendants had no predetermined winner and that certain Defendants had no knowledge of which party had won the auction or at which price.[13]

---

10. For example, after the Cablecom and Nalco deals, Apollo's executives continued to demand payback from Goldman for inviting them into those deals. Goldman, in an effort to repay these and other business opportunities, invited Apollo into the Kinder Morgan transaction. A KKR executive, in another example, felt KKR was owed by Providence after the PanAmSat LBO, telling a Providence executive: "I must say I am personally and we are institutionally very disappointed in how you guys have handled this situation with us. After panamsat and sungard, we should not be chasing after you guys to figure out a way to include us as real partners in susq [Susquehanna]."

11. For example, in referring to Blackstone's invitation to Goldman Sachs and Apollo to be a part of the Nalco transaction, a Goldman internal email states, "[l]et's be careful about what we say about how the group comes together."

12. For example, during the PanAmSat transaction, a Blackstone executive suggested that Blackstone bid separately from Carlyle and Providence in the first round of the auction and then the three firms could "come together in the second round."

13. During the Alltel transaction, Goldman Sachs PIA and TPG executed a "dawn raid," hoping to close a deal for Alltel weeks before

Defendants assert that losing bidders were occasionally invited into final deals for the reason that they had already conducted due diligence and were interested in the deal. There were six transactions in which losing bidders were invited into final deals and only five transactions in which the losing bidders agreed to become part of the final deal. The instances where losing bidders were invited to join a final deal involved different groups of Defendants and there are many instances in which losing bidders were not invited into final deals.[14]

*Jumping Deals.*

Plaintiffs contend that, as part of the alleged overarching conspiracy, Defendants did not "jump" each other's proprietary deals and never submitted a topping bid after a Target Company announced a signed agreement for sale. Plaintiffs further contend that, pursuant to the overarching conspiracy, Defendants "stepped down" during the auction process to allow a predetermined co-conspirator to win.

On the second day of the hearing on these motions, Plaintiffs chose to abandon the above arguments regarding joint bidding, "quid pro quos" and bid rigging to focus on this allegation as the gravamen of their overarching conspiracy claim. Plaintiffs' attorney stated that, "[y]ou have other activity that is illegal like bid rigging and other things like that but that's not the agreement. The agreement is not to jump a signed deal or a deal that hit a certain level in an auction. . . ."

The Plaintiffs' theory rests primarily on a contemporaneous email written by a TPG executive during the Freescale transaction, which states "KKR has agreed not to jump our deal since no one in private equity ever jumps an announced deal."[15] Plaintiffs contend that this statement, and other statements made during the Freescale and HCA transactions, in combination the fact that no topping bids were made during any of the transactions' "go-shop" periods, evidence an overarching conspiracy on the part of the Defendants not to

The bid deadline and before the "other two groups [including other defendants] kn[e]w what hit them." During the Clear Channel Transaction, there was an "intense" auction that "squeezed every last penny" from the winning bidding group. During the Michaels Stores transaction, the Defendants did not know each other's bid because KKR commented that anyone who bid higher than their $43.50/share bid (which did occur) would have "crossed over into 'stupid territory.' " In the Neiman Marcus transaction, the THL bidding group submitted a "[b]lind" bid with "no sense on price." Furthermore, when Bain learned about the winning bid, it reacted: "WOW!!!!!!!!!! If we were going to lose, I am glad it is by a lot!! $1.5 billion of equity!!" During Clear Channel transaction, after losing to another bidder, KKR called it a "very, very disappointing outcome," and lamented that "it's heart-breaking to lose," but noted that KKR "did everything [they] could and stretched very far." During the Neiman Marcus transaction, THL characterized TPG's win as "[v]ery depressing."

14. The six transactions in which losing bidders were invited into final deals were Clear Channel, Education Management, Michaels Stores, Nalco, PanAmSat, and Philips/NXP. The losing bidders did not choose to be part of the final Education Management transaction.

15. Plaintiffs also cite a number of other statements regarding the Defendants' decisions to "stand down." For instance, regarding the Freescale transaction, a Blackstone executive stated that "Henry Kravis [of KKR] just called to say congratulations and that they were standing down because he had told me before they would not jump a signed deal of ours." Regarding HCA, a Blackstone executive stated, "[t]he reason we didn't go forward was basically a decision on not jumping someone elses deal and creating rjr2 [referring to the Nabisco deal]. . . ." In another example, a Carlyle executive stated that KKR had asked "the industry to step down on HCA."

"jump" each other's announced agreements for sale.

Defendants contend that the TPG executive's statement and other statements cited by the Plaintiffs fail to evidence an overarching agreement. Defendants assert that those statements merely show a recognition on the part of the Defendants that "jumping" an announced deal was generally considered a poor business decision. Defendants assert that when a Target Company has already entered into an agreement to be sold to a buyer, the presence in the agreement of commonplace protection provisions makes it more costly for any party to submit competing bids.

Among these standard provisions are break-up fees (fees the company must pay the buyers if the company terminates the deal for a different offer) and matching rights (rights giving the current bidders the ability to match any competing offer made to the company after the current bidders' offer has been accepted). Defendants also contend that they independently decided not to "jump" certain deals for fear of retaliation from other Defendants on other deals. Defendants cite to contemporaneous correspondence indicating instances where Defendants were concerned that others would "jump" their deals or considered "jumping" deals, but were dissuaded due to potentially independent justifications.[16] Defendants assert the small sample of transactions, as limited by discovery, fails to show any systematic

behavior indicating an agreement not to compete.

*Expert Reports.*

Plaintiffs assert that economic evidence also supports an overarching conspiracy. They cite to one of their experts, who reviewed the characteristics of the large LBO market during the alleged conspiratorial era and concluded that there were more factors favoring the formation and operation of a cartel than factors that would act against its formation. Plaintiffs also refer to two of their other experts who concluded that actions taken by Defendants during the alleged conspiratorial era were consistent with coordinated behavior and inconsistent with competition.

*The HCA transaction.*

Count Two of the Fifth Amended Complaint alleges a conspiracy involving certain Defendants to rig bids and not to compete with respect to the leverage buyout transaction of HCA, one of the Target Companies. The Defendants named in Count Two are Blackstone, Carlyle, TPG, Goldman Sachs, Bain, and KKR. Bain and KKR have been released from the claim. Blackstone, Carlyle, TPG, and Goldman Sachs are referred to as the "Remaining HCA Defendants." The HCA Transaction is also, as explained below, highly relevant to Count One. The detailed circumstances surrounding the HCA transaction are as follows.

In 2006, HCA engaged Merrill Lynch to review various strategic alternatives to "enhance shareholder value." In April

---

**16.** For instance, during the Aramark Deal, a Goldman Sachs executive cautioned that announcing a buyout with a two-firm consortium "will hurt GS a lot and cause people to increase the likely hood [sic] that they jump the [deal]." In regards to the Sungard transaction, a TPG executive explained that being "aggressive," would make "enemies," with the other Defendants, "while perhaps benefiting noone [sic] but the [company's] share-

holders." A Carlyle executive stated, "[s]ome have proposed we try to compete by participating in a competing deal [HCA]. I do not think that is a good idea for many reasons, but particularly because I do not want to be in a pissing battle with KKR at the same time we are teaming on other deals elsewhere." With respect to Aramark, an Apollo executive concluded "we'd probably spend time and money and piss off friends."

2006, Merrill Lynch met with representatives of Bain, KKR, and Merrill Lynch Global Private Equity (collectively, the "HCA Sponsors") to discuss the possibility of an LBO transaction of HCA by the HCA Sponsors. HCA was viewed in the private equity world as a healthcare industry leader with "topnotch" assets. In May 2006, HCA's board of directors granted the HCA Sponsors' request to begin due diligence on HCA.

*Rumors and Interest in the Deal.*

By June 15, 2006 rumors about a potential purchase of HCA by the HCA sponsors had begun to circulate. KKR reported to its investment committee: "We and Merrill have received multiple inbound phone calls from both other sponsors and investment banks...." Around that time KKR stated "we have done our best to dispel the rumors with everyone other than Warburg ... [who we] have promised a place in the consortium provided they sit on the sidelines for now, and Citigroup, to whom we have told that they will have a place in the financing as long as they do not make outbound phone calls."

Goldman Sachs learned of the potential HCA LBO in June, and was interested in being involved. Ken Hitchner, Managing Director of Goldman Sachs, stated in an intra-office email that Mike Michelson at KKR "has spent the last six months praising us and implying the next one was ours." Nat Zilkha at Goldman Sachs noted in his reply to Hitchner that Goldman Sachs had just invited KKR into the Kinder Morgan deal. Blackstone likewise discussed the rumor stating in an intra-office email: "We are definitely interested in exploring hca further."

*HCA Sponsors' Negotiations.*

On June 30, 2006, the HCA Sponsors contacted management and stated that they had conducted sufficient due diligence to confirm their view that an LBO involving HCA was feasible and that they expected to be in a position to determine whether to submit a proposal regarding such a transaction by July 14, 2006. On that same day, HCA's board of directors established a Special Committee with the full power and authority to negotiate a possible acquisition of HCA by the HCA Sponsors and any other alternatives and to engage Credit Suisse as financial advisor.

On July 3, 2006, the Special Committee rejected Bain and KKR's request to approach additional potential equity sources. According to a July 31, 2006 internal email from David Bonderman of TPG (relating a conversation he had with Nate Thorne of Merrill Lynch), the Special Committee rejected the request "so that there were enough firms outside the deal so that there could be a competing offer and [the Special Committee] had left us [TPG] out of the process on purpose for this reason."

On July 18, 2006, Bain reported internally that the HCA Sponsors agreed on a price with the Special Committee for the acquisition of HCA at $51.00 per share. On July 21, 2006, Credit Suisse calculated, based upon Merrill Lynch's July 20, 2006 "LBO Implications" report on HCA, that HCA's current value is $55.50 per share.

*WSJ Article and Growing Interest in the deal.*

On July 19, 2006, the Wall Street Journal published an article regarding rumors of a potential LBO of HCA. Other private equity firms immediately considered the deal. On July 19, 2006, Goldman Sachs and Apollo began discussing the possibility of forming a consortium. On July 19, 2006, Carlyle learned about an HCA LBO through the Wall Street Journal and began internal discussions. Upon learning the news, Betchel of Carlyle put a call into Michelson of KKR about joining KKR's consortium. TPG, likewise, spent days

trying to contact Michelson and Bain to request involvement in the HCA deal.

*Announcement of the HCA Sponsors' Agreement.*

On the morning of July 24, 2006 the HCA's board of directors announced it had approved a merger agreement with the HCA Sponsors. HCA was, therefore, the HCA Sponsor's proprietary deal. The price for HCA was $51.00 per share, which "represented a premium of approximately 18% to the closing share price of the HCA common stock on July 18, 2006, the last trading day prior to press reports of rumors regarding a potential acquisition of the Company." The approved merger agreement included a fifty-day "go shop" provision that permitted competing consortiums to form and submit superior proposals from July 24, 2006 through September 12, 2006. The same day, Boon Sim of Credit Suisse First Boston ("CSFB"), the lead advisor for the Special Committee of the HCA board of directors, asked a number of fellow CSFB employees to call the big private equity firms about HCA.

*Flurry of Activity Amongst the Remaining HCA Defendants.*

Following the announcement of the merger, there was a flurry of activity amongst the remaining HCA Defendants over the following ninety-six hours. The communications indicate interest in HCA and a desire to potentially form a competing consortium. The evidence includes an assessment of a potential purchase price at price per share that was higher than the one agreed to by the HCA sponsors and a report stating that "HCA is a high quality hospital company trading at the low end of historical averages" with "good market positions in growing markets."

*An Abrupt–Stand Down by the Remaining HCA Defendants.*

On the morning of July 27, 2006, all four Remaining HCA Defendants had abruptly notified KKR directly of their decision not to compete on HCA. Jonathan Coslet of TPG emailed TPG's top executives: "I spoke to both Michaelson [KKR] and Paglicua [Bain] and told them we had decided to pass on the HCA situation." On July 26, 2006, KKR sent an intra-office email stating that "TPG and GS have both informed us that they will not compete" on HCA. On July 26, 2006, Henry Kravis of KKR sent an intra-office email to his top executives stating: "I received a call from Tony James [of Blackstone] today. He called to tell me that Blackstone was not going to bid on HCA. Happy to give you additional color if you want it." Two days later, a Carlyle executive wrote to Alex Navab of KKR: "I left you a voicemail. We are NOT forming a competing group (although we have received many calls), we are not signing an NDA, we are not taking any info and we will not in any way interfere with your deal. We would, of course, love to join you if you need any more equity, but rest assured that you will not see us in any other context on HCA." These notifications came within ninety-six hours of the fifty-day "go shop" period having commenced.

*Reasons for the Stand–Down.*

After TPG's Jonathan Coslet informed TPG's key executives of the decision to "stand down" on HCA, TPG's Philippe Costeletos replied: "Probably the right decision even though I hate to see a good deal get away. I guess we'll find out some day how much our relationship means to them." Coslet responded to Costeletos: "Yup. All we can do is do onto others as we want them to do unto us ... it will pay off in the long run even though it feels bad in the short run."

On July 29, 2006, Costeletos e-mailed David Bonderman and Coslet stating that he delivered the same message to Merrill

Lynch that TPG had delivered to KKR and Bain, namely that "we [at TPG] were extremely disappointed" not to be included in the consortium and "while we considered a competing bid [for HCA], we felt that our relationship with them, KKR and Bain was more important."

On July 28, 2006, Joseph Baratta of Blackstone in Europe emailed Neil Simpkins of Blackstone asking about HCA. Mr. Simpkins responded that "the reason we didn't go forward was basically a decision on not jumping someone elses deal and creating rjr 2 with us as kkr . . . ." Baratta responded: "I think deal represents good value and is a shame we let kkr get away with highway robbery but understand decision. There may also be something else at play with henry [Kravis of KKR] and steve [Schwartzman of Blackstone]."

In response to their decision not to pursue HCA, a Blackstone executive wrote that "Pags [Pagliuca of Bain] probably will be able to steal the company." On July 27, 2006, another Blackstone executive wrote, "[a]fter some soul searching, we decided wisdom was better part of valour and passed on hca . . . . charlie was right; we are a bunch of p* *s*es—I am on plane and will call you both with the rationale although it still drives me crazy."

On August 1, 2006, Tony James of Blackstone briefly contemplated bidding for HCA after "vigorous competition" by KKR on the Philips transaction in which KKR prevailed in an auction, but Neil Simpkins suggested not even signing a confidentiality agreement unless they planned to win because "we [would] just lose all the value we gained by dropping a week ago. . . ." On July 26, 2006, Steve Wise of Carlyle sent an intra-office email stating "I think we should drop out of the CSFB process. Otherwise, we may be sending a bad signal to KKR/Bain." The same day, David Rubenstein of Carlyle sent an intra-office email stating that HCA "is over" and that "[n]o group is being formed to top the offer."

*Evidence of an Agreement to Stand–Down.*

On August 7, 2006, Larry Berg of Apollo wrote an internal email to Mark Rowan of Apollo about HCA and rumors that Apollo and Warburg may form a competing consortium. Berg questioned whether "apollo would want to topple a kkr deal." He concluded his email with an observation about KKR: "p.s. be careful of the kkr call. They offered Warburg a piece but they turned it down because it was too small. I'm sure they offered tpg a piece to stand down. We're not in that boy's club yet and let's not agree to stand down too quickly and meekly. I'm tired of mike michaelson ignoring us."

On September 11, 2006 in an intra-office email exchange between top executives of Carlyle who had just learned that KKR had decided to compete for their Freescale deal, Daniel F. Akerson of Carlyle responded: "And just think, KKR asked the industry to step down on HCA."

*Second Agreement to Stand–Down on HCA.*

In September, 2006, a consortium of Blackstone, Carlyle, TPG, and Permira were negotiating the buyout of Freescale. On September 10, 2006, KKR, Silver Lake, Bain, and Apax Partners Worldwide delivered to Freescale's board an unsolicited written indication of interest to acquire Freescale.

The next day, Blackstone, in apparent retaliation, immediately contemplated a bid to buy HCA at $55 per share. The following day, September 12, 2006, a proposed buying consortium of Blackstone, TPG, Carlyle and Permira was considering HCA. The same day, Tony James of Blackstone called George Roberts of KKR to

say Blackstone signed a confidentiality agreement on HCA.

On September 15, 2006, KKR immediately withdrew its interest in Freescale. That same day, the Freescale board of directors accepted the Blackstone consortium's bid to buy the company at $40.00 per share and entered into a definitive agreement with that consortium that afternoon. Tony James wrote that night: "Henry Kravis just called to say congratulations and that they were standing down because he had told me before they would not jump a signed deal of ours."

That same night, September 15, 2006, George Roberts of KKR wrote Tony James of Blackstone: "Congrats. Pls give me a call on my cell." Two days later, Tony James responded:

Thx for the call George. I talked to Henry [Kravis] Friday night and he was good enough to call Steve [Schwarzman] Saturday. We would much rather work with you guys than against you. Together we can be unstoppable but in opposition we can cost each other a lot of money. I hope to be in a position to call you with a large exclusive PTP [public to private] in the next week to 10 days. You are the natural but we need to get management's clearance. Sorry for the email but I don't have your cell number. Tony.

George Roberts responded the same day: "Agreed."

On the morning of September 16, 2006, Henry Kravis wrote an internal e-mail to his KKR top executives: "I spoke with Tony James last night and Steve Schwarzman this morning re Freescale. They are very happy campers that we are not going any further, since they now have a signed agreement. We got lucky!!!! They told me that they are working on a large one, which they say is 'right up our alley' and they will be happy to have us work with

them. We will see!!!" A September 16, 2006, Carlyle internal email stated: "As you may have heard, kkr is dropping out [on FreeScale]. Kravis says he would not have upset the previous deal if he had known how close we were. But that cost us eight hundred million." In the same email chain on September 16, 2006, Carlyle confirmed that Blackstone had already "dropped HCA."

On September 16, 2006, after learning that KKR had decided to withdraw from Freescale, a Goldman Sachs executive observed "club etiquette prevails...." On September 19, 2006, John Marren of TPG, wrote in an email concerning the Freescale LBO that "KKR has agreed not to jump our deal since no one in private equity ever jumps an announced deal."

*Due Diligence.*

The KKR led consortium took nearly seven weeks to perform due diligence on a potential LBO of HCA and to make a determination to propose an initial offer per share for HCA. On the other hand, within forty-eight hours of the fifty-day "go shop" period having commenced, all four Remaining HCA Defendants agreed not to compete with the KKR-led consortium. KKR's Mike Michelson testified at a deposition that due diligence could not have been completed in such a short period of time.

*HCA as an Investment.*

KKR's $1.2 billion investment in HCA nearly doubled in value to $2 billion in four years.

*Lack of Competition for HCA.*

From July 24, 2006 through September 12, 2006 (the fifty-day "go shop" period), representatives of Credit Suisse and Morgan Stanley contacted parties that they believed, based on size and business interests, would be capable of, and might be

interested in, consummating an acquisition of HCA. No party submitted a competing proposal for HCA. The HCA deal closed on November 11, 2006 at $51.00 per share without any other private equity firm having submitted a competing bid.

## II. Legal Standards. The Summary Judgment Standard.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In ruling on a summary judgment motion, the Court views the record "in the light most favorable to the nonmovant." *Hoffman v. Applicators Sales and Service, Inc.*, 439 F.3d 9, 11 (1st Cir.2006) (citing *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 50 (1st Cir.2000)). All reasonable inferences are to be drawn in the favor of the nonmoving party. *Poulis–Minott v. Smith*, 388 F.3d 354, 361 (1 Cir.2004).

## Section 1 of the Sherman Antitrust Act.

■ Section 1 of the Sherman Act prohibits "every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States. . . ." 15 U.S.C. § 1. A Section 1 claim requires "(1) the existence of a contract, combination or conspiracy; (2) that the agreement unreasonably restrained trade . . . and (3) that the restraint affected interstate commerce." *Lee v. Life Ins. Co. of N. Am.*, 829 F.Supp. 529, 535 (D.R.I.1993), aff'd, 23 F.3d 14 (1st Cir.1994).

## Permissible Inferences for Establishing the Existence of an Antitrust Conspiracy.

■ "Section 1 by its plain terms reaches only 'agreements'—whether tacit or express." *White v. R.M. Packer Co., Inc.*, 635 F.3d 571, 575 (1st Cir.2011) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 553, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "It does not reach independent decisions, even if they lead to the same anticompetitive result as an actual agreement among market actors." *White*, 635 F.3d at 575. Accordingly, in order to survive summary judgment, plaintiffs must produce direct or circumstantial evidence that is not only consistent with conspiracy, but "tends to exclude the possibility of independent action." *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 767, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

■ While the summary judgment standard, as set forth above, requires all reasonable inferences to be drawn in favor of the nonmoving party, the Supreme Court has "limit[ed] the range of permissible inferences from ambiguous evidence in a § 1 case," holding that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[I]n other words, [plaintiffs] must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action. . . ." *Id.*

■ Evidence that tends to exclude the possibility of independent action may include "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," *Twombly*, 550 U.S. at 556 n. 4, 127 S.Ct. 1955 (internal citations omitted), or "uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable or accompanied by other conduct that in context suggests that each competitor failed to make an independent decision," *Brown*

*v. Pro Football, Inc.*, 518 U.S. 231, 241, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996) (internal citations omitted).

*Establishing the Existence of an Overarching Conspiracy.*

■ Where a single, overarching conspiracy derived from discrete incidents is alleged, as is the case in Count One, the evidence must establish a " 'larger picture' from which inferences of a wider conspiracy can be drawn...." *In re Iowa Ready–Mix Concrete Antitrust Litigation*, 768 F.Supp.2d 961, 975 (N.D.Iowa 2011). In determining whether such a "larger picture" exists, Courts, in other contexts, have looked for "(1) a common goal, (2) interdependence among the participants, and (3) overlap among the participants." *See, e.g., U.S. v. Portela*, 167 F.3d 687, 695 (1st Cir.1999) (drug conspiracy case); *U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871, 899 (2010) (False Claims Act case).

■ A "common goal" exists where there is "one objective, or set of objectives, or an overall objective to be achieved by multiple actions." *U.S. v. Richerson*, 833 F.2d 1147, 1153 (5th Cir.1987) (quoting *United States v. Perez*, 489 F.2d 51, 62 (5th Cir.1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974) (internal quotations omitted)); see *In re High–Tech Employee Antitrust Litigation*, 856 F.Supp.2d 1103, 1119 (N.D.Cal.2012) (in a Section 1 case, a common goal exists where six discrete agreements were identical and agreed to in secrecy by closely connected executives of defendant companies within a span of two years). "Where the evidence demonstrates that all of the alleged co-conspirators directed their efforts towards the accomplishment of a single goal or common purpose, then a single conspiracy exists." *U.S. v. Richerson*, 833 F.2d at 1153.

■ "Interdependence" can be established where "the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme." *U.S. v. Portela*, 167 F.3d 687, 695 (1st Cir.1999) (quoting *United States v. Wilson*, 116 F.3d 1066, 1075–76 (5th Cir.1997) (internal quotations omitted)); see *In re Magnesium Oxide Antitrust Litigation*, 2011 WL 5008090 (D.N.J. 2011) (in a Section 1 case, a single, overarching conspiracy exists where one agreement not to compete with respect to one product was occasioned by a second agreement to allocate the market with respect to another product). In the criminal context, courts have concluded that "[e]ach individual must think the aspects of the venture interdependent, and each defendant's state of mind, and not his mere participation in some branch of the venture, is key." *Portela*, 167 F.3d at 695 (explaining that "a single [drug] conspiracy [exists] if the continued health of the trafficking and distribution network necessarily depends on the continued efforts of multiple suppliers").

■ "The 'overlap' requirement can be satisfied by the pervasive involvement of a single 'core conspirator,' a hub character...." *Portela*, 167 F.3d at 695. While it is not necessary that every defendant participate in every transaction, *id.*, the mere overlap of some of the defendants in some of the transactions is, on its own, insufficient to establish an overarching agreement. See *Precision Associates, Inc. v. Panalpina World Transport (Holding) Ltd.*, 2011 WL 7053807, *29 (E.D.N.Y. 2011) ("Some overlapping parties" were insufficient to show that various conspiracies were "formulated pursuant to an overarching scheme."); *In re Iowa Ready–Mix Concrete Antitrust Litigation*, 768 F.Supp.2d 961, 975 (N.D.Iowa 2011).

"[W]hile the analysis of 'common goals,' 'interdependence,' and 'overlap' is useful for resolving challenges to the sufficiency of the evidence ... [the courts have] looked beyond any such lists of factors to 'the totality of the evidence' in determining whether there is factual support for a finding of a single conspiracy." *Portela*, 167 F.3d at 696.

### III. Analysis. Count One: Overarching Conspiracy.

The sole issue that must be determined by this Court as to Count One is whether there is sufficient evidence to create a genuine issue as to the existence of an overarching conspiracy.

The majority of the evidence that Plaintiffs cite as support for their position consists of the Defendants' decisions to partner with one another to pursue the purchase of the Target Companies. Joint bidding and the formation of consortiums, however, are, as Plaintiffs concede, established and appropriate business practices in the industry. Like the purchase of any other asset, parties may join together to purchase large public companies. Defendants have cited evidence indicating that such partnerships are beneficial to the individual Defendant for a number of reasons that are unrelated to any alleged overarching conspiracy, including the fact that such partnerships minimize the costs and the risk for each partner. The existence of these partnerships is, therefore, just as consistent, if not more consistent, with a widely-accepted and independent business strategy, as it is with a vast price-fixing conspiracy.

The occasional inclusion of a losing bidder in a final deal is no different. A losing bidder that has interest, knowledge and the ability to contribute to a final transaction may be invited into a consortium for the same reasons that any Defendant was originally invited into a consortium. Each consortium member may want to, among other things, further minimize its costs and risk even after the bidding has ended. Such conduct, on its own, does not suggest an overarching conspiracy. Nor does the Defendants' occasional acknowledgment that joint bidding may minimize competition. A Defendant interested in a specific transaction may have an independent motivation to form a consortium to minimize competition as to a single transaction that is unrelated to a market-wide, price-fixing conspiracy.

Furthermore, the frequent communications, friendly relationships and the "quid pro quo" arrangements between Defendants can be thought of as nothing more than the natural consequences of these partnerships. Defendants that have previously worked together or are currently working together would be expected to communicate with each other and to exchange business opportunities. That is the very nature of a business relationship and a customary practice in any industry. Accordingly, the mere fact that Defendants are bidding together, working together, and communicating with respect to a specific transaction does not tend to exclude the possibility that they are acting independently across the relevant market.

The Plaintiffs further contend that the Defendants' motivations to avoid creating RJR Nabisco-like price runups suggests the existence of an overarching conspiracy. A Defendant's decision not to pursue a specific transaction, however, is, without more, legally insufficient to allow an inference of a market-wide price-fixing scheme. There is no legal requirement that Defendants compete or, for that matter, inflate the price of a Target Company. At some point in the process, each Defendant will either win the transaction or "step down" to avoid purchasing a potentially over-

valued asset. The decision as to whether to continue to pursue a given transaction or to "step down" is a fundamental function of the private equity business. There are enumerable reasons why a given Defendant would make the individual decision to pass on a specific transaction.

The Defendants' alleged motivations to maintain friendly relationships with other Defendants in the industry further fail to suggest the existence of a market-wide conspiracy. A Defendant who is acting independently would have the same motivation. Each Defendant may simultaneously, but independently, institute a policy of not inciting retaliation from other Defendants. As the Supreme Court and First Circuit have noted, such instances exist where independent actions can lead to less competitive results. *See, e.g., White,* 635 F.3d at 575. Thus, the fact that Defendants failed to compete with the same ferocity of prior eras or were concerned that their actions would incite retaliation cannot provide an inference of an overarching conspiracy.

The evidence of each specific transaction, including Defendants' communications with each other, for the most part, fails to connect to a "larger picture" of an overarching conspiracy. Even where the evidence suggests misconduct related to a single transaction, there is largely no indication that all the transactions were, in turn, connected to a market-wide agreement. Rather, the evidence shows a kaleidoscope of interactions among an ever-rotating, overlapping cast of Defendants as they reacted to the spontaneous events of the market. While some groups of transactions and Defendants can be connected by "quid pro quo" arrangements, correspondence, or prior working relationships, there is little evidence in the record suggesting that any single interaction was the result of a larger scheme. Furthermore, unlike other cases where an overarching conspiracy was found, here there is no single Defendant that was involved in every transaction or other indication that the transactions were interdependent.[17]

█ When pressed at the second day of oral argument for the evidence supporting the "larger picture," the Plaintiffs largely abandoned the above arguments to focus on the following statement by a TPG executive regarding the Freescale transaction, a proprietary deal: "KKR has agreed not to jump our deal since no one in private equity ever jumps an announced deal." Plaintiffs contend that this statement, in combination with the fact that Defendants never "jumped" a deal during the "go-shop" period,[18] as well other state-

---

17. The Court further concludes that the Plaintiffs' experts' opinions fail to support an inference of an overarching agreement. The evidence on the record is not of a nature that requires an expert's insight nor is there an indication that the experts were applying the correct legal standard in determining the existence of an overarching conspiracy. Most significantly, however, the experts' ultimate conclusions do not provide a permissible inference under the controlling case law. The conclusions that there are "factors favoring the formation and operation of a cartel" or conduct "consistent with coordinated behavior and inconsistent with competition" do not exclude the possibility of independent action. As the case law makes clear, parallel behavior that is inconsistent with competition may result from independent action.

18. Although Plaintiffs contend that this statement applies to all deals, including auctions, the statement was made in the context of a proprietary deal and references "jumping" announced deals, which applies only to the nine proprietary purchases for sale where a deal is reached, announced publicly, and shopped to the market. Furthermore, Defendants' conduct during auctions does not provide any discernable pattern of behavior suggesting that Defendants were uniformly "stepping down." The auction process is, moreover, essentially different from the proprietary process, where "jumping" an an-

ments such as the Goldman Sachs executive's observation that "club etiquette prevail[ed]," with respect to the Freescale transaction, provides a permissible inference of an overarching conspiracy.

The statement that "no one in private equity ever jumps an announced deal" and the fact that no announced deals for the propriety transactions at issue were ever "jumped," tends to show that such conduct was the practice in the industry. On its own, these two pieces of evidence would be insufficient to provide a permissible inference of an overarching conspiracy. They do not tend to exclude the possibility that each Defendant independently decided not to pursue other Defendants' proprietary deals because, for instance, a pursuit of such deals was generally futile due to matching rights.

When viewed in combination with the Goldman Sachs executive's statement and in the light most favorable to the Plaintiffs, however, the evidence suggests that the practice was not the result of mere independent conduct. Rather, the term "club etiquette" denotes an accepted code of conduct between the Defendants.[19] Taken together, this evidence suggests that, when KKR "stepped down" on the Freescale transaction, it was adhering to some code agreed to by the Defendants not to "jump" announced deals. The Court holds that this evidence tends to exclude the possibility of independent action. Count One may, therefore, proceed solely on an alleged overarching agreement between the Defendants to refrain from "jumping" each other's announced proprietary deals.

Plaintiffs persistent hesitance to narrow their claim to something cognizable and supported by the evidence has made this matter unnecessarily complex and nearly warranted its dismissal. Nevertheless, the Court shall allow the Plaintiffs to proceed solely on this more narrowly defined overarching conspiracy because the Plaintiffs included allegations that Defendants did not "jump" each other's proprietary deals in the Fifth Amended Complaint and argued in response to the present motions that the evidence supported these allegations. Furthermore, the Court concludes that a more limited overarching conspiracy to refrain from "jumping" each other's proprietary deals constitutes "a continuing agreement, understanding, and conspiracy in restraint of trade to allocate the market for and artificially fix, maintain, or stabilize prices of securities in club LBOs" as alleged in Count One of the Fifth Amended Complaint.

The Defendants' Omnibus Motion as to Count One is, therefore, denied. The Plaintiffs may proceed under Count One solely on an alleged overarching agreement between the Defendants to refrain from "jumping" each other's announced proprietary deals.

JP Morgan's individual motion is allowed. The evidence does not establish that JP Morgan was in the business of bidding on Target Companies and does not otherwise support its participation in the narrowed overarching conspiracy. The Court shall entertain renewed individual motions for summary judgment from the other Defendants contending that the evidence does not create a genuine dispute as

nounced purchase for sale during the "go shop" period is of the very nature of that process.

**19.** The term "club" is defined as "an association of persons for some common object usu. jointly supported and meeting periodically."

WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 252 (1984). The term "etiquette" is defined as "the code of ethical behavior among the members of a profession." RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 449 (2nd Ed. 1998).

to their participation in the more narrowly-defined overarching conspiracy.

*Count Two: the HCA Claim.*

█ Unlike Count One, Count Two does not require the showing of a "larger picture." The only issue relevant to Count Two, is whether the evidence provides a permissible inference of an agreement to "stand down" as to the HCA transaction only. The Court holds that the evidence does provide such an inference.

The evidence establishes that each Remaining HCA Defendant showed interest in the HCA transaction, but promptly "stepped down" from making a topping bid within 48 hours of the commencement of the fifty-day "go-shop" period. The evidence further shows that the Remaining HCA Defendants communicated their decision to "step down" on HCA to KKR or Bain within ninety-six hours of the commencement of the "go shop" period and subsequently lamented having forgone a potentially lucrative deal. While this uniform conduct on the part of the Remaining HCA Defendants would not, on its own, support an inference of a conspiracy as to HCA, in combination with at least two statements made by executives of the Remaining HCA Defendants, it does support such an inference.

The first statement was made during an intra-office email exchange between top executives of Carlyle after they had learned that KKR had decided to compete for Freescale, a transaction for which Carlyle was close to an agreement. The statement reads, "And just think, KKR asked the industry to step down on HCA." This statement is significant for two reasons. First, it suggests that the Remaining HCA Defendants did not pursue the HCA transaction because they had previously agreed to do what KKR had asked, namely to "step down" on HCA. Second, the shock conveyed in the statement by the Carlyle executive at KKR's decision to pursue Freescale indicates that KKR's decision was a breach of its agreement not to pursue Freescale.

The second statement was made by a Blackstone executive after KKR had ultimately decided to pass on Freescale. It reads, "Henry Kravis [of KKR] just called to say congratulations and that they were standing down because he had told me before they would not jump a signed deal of ours." This statement suggests there was a previous agreement not to "jump" Freescale and that KKR had decided to adhere to that agreement. Furthermore, in combination with the rest of the evidence, the statement provides an inference that the decision by the Remaining HCA Defendants to "step down" on HCA was in exchange for KKR not competing for Freescale.

These statements tend to exclude the possibility that the Remaining HCA Defendants' uniform conduct was the result of independent actions. The Remaining HCA Defendants' motions as to Count Two are, therefore, denied.

In sum, the Defendants' omnibus motion as to Count One (Docket No. 630) is DENIED with respect to the overarching conspiracy relating to the proprietary deals. JP Morgan's individual motion (Docket No. 643) is ALLOWED. The remaining Defendants' individual motions (Docket Nos. 620, 622, 624, 626, 629, 633, 635, 636, 639, 644) are DENIED as to Count One but may be renewed to address the evidence regarding their participation in the more narrowly-defined overarching conspiracy. The HCA Defendants' motions as to Count Two (No. 641, 639, 626, 622, 620) are DENIED.

SO ORDERED.

## MEMORANDUM AND ORDER

This matter comes before the Court on the HCA Defendants' Motion for Reconsideration of the Court's Order Denying Summary Judgment on Plaintiffs' HCA claim. In a March 13, 2013 Memorandum and Order (the "Prior Order"), *Dahl v. Bain Capital Partners, LLC,* 937 F.Supp.2d 119 (D.Mass.2013), this Court denied summary judgment as to Count Two of the Plaintiffs' Fifth Amended Complaint. The HCA Defendants contend that the Prior Order contains manifest errors of law caused by the Court's misapprehension of the undisputed chronology of events related to Count Two.

### I. *Background.*

Plaintiffs are former shareholders of HCA and Count Two alleges, under section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, a conspiracy on the part of Goldman Sachs, Carlyle, TPG and Blackstone (the "HCA Defendants") to fix the price paid to the Plaintiffs during the 2006 leverage buyout of HCA. KKR and Bain formed a consortium (the "Winning HCA Consortium") which ultimately consummated the HCA transaction. KKR and Bain were originally named as defendants under Count Two, but were dismissed due to shareholders' releases.

In the Prior Order, the Court found a dispute of fact as to whether the HCA Defendants participated in an agreement with the Winning HCA Consortium to refrain from competing for HCA. *Dahl,* 937 F.Supp.2d at 139. The Court concluded that the evidence suggested at least two instances, one in July of 2006 and one in September of 2006, where an agreement to refrain from "jumping" HCA was reached between the HCA Defendants and the

Winning HCA Consortium. *Id.* at 131–33, 139. The Court, accordingly, held that the evidence supported a denial of the HCA Defendants' summary judgment motions as to Count Two. *Id.* at 139.

Much of the evidence relating to the HCA transaction was also made in the context of another transaction, the Freescale leverage buyout, which occurred in September of 2006. A consortium including three of the HCA Defendants, Carlyle, TPG and Blackstone, won the Freescale deal (the "Winning Freescale Consortium"). Goldman Sachs, who has both a private equity division and a investment banking division, was acting in its investment banking capacity as a financial advisor to Freescale during the Freescale leveraged buyout.

As to the circumstances of the HCA and Freescale transactions, in late July of 2006 the Winning HCA Consortium was negotiating a deal for HCA. As the Court concluded in the Prior Order, the evidence, in the light most favorable to the Plaintiffs, shows that the Winning HCA Consortium had "asked the industry to step down on HCA" and, despite strong interest in HCA, the HCA Defendants "stood down" and communicated their decision to "stand down" to the Winning HCA Consortium within ninety-six hours of the transaction's fifty-day "go shop" period.[1] *Id.* at 131.

The evidence further shows that, in September of 2006, the Winning Freescale Consortium was close to securing a deal to purchase Freescale when a consortium including Bain and KKR sent an indication of interest to the Freescale Board, disrupting the Winning Freescale Consortium's deal. *Id.* at 132–33. The Winning Freescale Consortium, shocked by Bain and

---

1. A "go-shop" period is a period after a deal is signed, but before the deal closes, during which the financial advisor to the company undergoing the buyout rallies competition and seeks additional bids.

KKR's action, began mounting, as retaliation, a competing bid for HCA. *Id.* The Prior Order found that, due to the threat of the competing bids, the consortiums communicated with each other and abruptly "stood down" from each other's respective deals. *Id.*

The Court found in the Prior Order that the timeline of events when paired with at least two statements made by the HCA Defendants suggested that the HCA Defendants were acting pursuant to an agreement to refrain from "jumping" HCA. *Id.* at 138–39. As the Court explained in the Prior Order:

> The first statement was made during an intra-office email exchange between top executives of Carlyle after they had learned that KKR had decided to compete for Freescale, a transaction for which Carlyle was close to an agreement. The statement reads, "And just think, KKR asked the industry to step down on HCA." This statement is significant for two reasons. First, it suggests that the Remaining HCA Defendants did not pursue the HCA transaction because they had previously agreed to do what KKR had asked, namely to "step down" on HCA. Second, the shock conveyed in the statement by the Carlyle executive at KKR's decision to pursue Freescale indicates that KKR's decision was a breach of its agreement not to pursue Freescale.

> The second statement was made by a Blackstone executive after KKR had ultimately decided to pass on Freescale. It reads, "Henry Kravis [of KKR] just called to say congratulations and that they were standing down because he had told me before they would not jump a signed deal of ours." This statement suggests there was a previous agreement not to "jump" Freescale and that KKR had decided to adhere to that

agreement. Furthermore, in combination with the rest of the evidence, the statement provides an inference that the decision by the Remaining HCA Defendants to "step down" on HCA was in exchange for KKR not competing for Freescale.

*Id.* at 138–39.

## II.  *Legal Standard.*

To obtain relief on a motion for reconsideration, "the movant must demonstrate either that newly discovered evidence (not previously available) has come to light or that the rendering court committed a manifest error of law." *Palmer v. Champion Mortg.,* 465 F.3d 24, 29 (1st Cir.2006); *Latin Am. Music Co. v. Am. Soc'y of Composers,* 642 F.3d 87, 91 (1st Cir.2011). "Unless the court has misapprehended some material fact or point of law, such a motion is normally not a promising vehicle for revisiting a party's case and rearguing theories previously advanced and rejected." *Palmer,* 465 F.3d at 30 (citing *Appeal of Sun Pipe Line Co.,* 831 F.2d 22, 24–25 (1st Cir.1987)).

## III.  *Analysis.*

### a.  *Evidence Supporting Two Instances of Agreements.*

The HCA Defendants argue that, in the Prior Order, the Court erroneously held that the evidence, in the light most favorable to the Plaintiffs, supported two points in the chronology of events at which an agreement to "stand down" on HCA can be inferred. The HCA Defendants specifically challenge the Court's conclusion that the evidence allows an inference that the "stand down" on "HCA was in exchange for KKR not competing for Freescale." *Dahl,* 937 F.Supp.2d at 139. The HCA Defendants argue that there could not have been an exchange for Freescale in either July or September and that without

such an exchange an agreement to "stand down" on HCA would have been implausible.

### 1. *Agreement to "Stand Down" in July.*

The HCA Defendants argue that the "Plaintiffs do not, and cannot, offer any evidence that Freescale was even discussed with KKR or Bain in the context of HCA [in July] or otherwise prior to the KKR bid for Freescale." The Court reaffirms its prior holding on this matter for three reasons.

First, an exchange with respect to Freescale was not necessary to the Court's holding that the evidence creates an issue of fact as to the existence of an agreement to "stand down" on HCA in July. Rather, the Court held that KKR's request to the industry and the evidence of each HCA Defendant's precipitous "stand down" was sufficient to "suggest[ ] that the [ ] HCA Defendants did not pursue the HCA transaction because they had previously agreed to do what KKR had asked, namely to 'step down' on HCA." Id. at * 16. Such evidence alone tends to exclude the possibility of independent action. *White v. R.M. Packer Co., Inc.*, 635 F.3d 571, 576 (1st Cir.2011) (A tacit agreement under the Sherman Act may be found where there is " 'uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable or accompanied by other conduct that in context suggests that each competitor failed to make an independent decision.' ") (quoting *Brown v. Pro Football, Inc.*, 518 U.S. 231, 241, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996)).

Second, contrary to the HCA Defendants' argument, the evidence does support an inference that an exchange for Freescale occurred in July. The evidence shows that Carlyle had an expectation of reciprocation with respect to Freescale after KKR "asked the industry to step down on HCA." The evidence also shows that KKR, in "standing down" on Freescale, "had told [Blackstone] before [that it] would not jump a signed deal of [theirs]." These statements allow for an inference that an exchange for Freescale was made in July. Such an inference, in turn, acts to bolster the conclusion that the evidence tends to exclude the possibility that the HCA Defendants were acting independently when they decided to "stand down" on HCA.

Third, it does not matter whether or not an exchange was made specifically for Freescale. While the HCA Defendants' contend that KKR, Bain and Carlyle did not know about the Freescale negotiations in July, such a contention is largely irrelevant. The exchange could have been made for the next signed deal or for all future signed deals.[2] The evidence simply shows that Carlyle considered KKR's pursuit of Freescale in September a breach of an agreement that had required it to "stand down" on HCA in July and that KKR had told Blackstone before that it would not

---

**2.** An agreement to refrain from "jumping" the next signed deal or any future signed deal is not, as the Defendants argue, too speculative to have benefitted the HCA Defendants, making their motive for "standing down" on HCA implausible. KKR and Bain's promise that it would not "jump" a future signed deal constitutes a tangible benefit to the HCA Defendants, who are in the business of signing deals. Carlyle further argues that "the alleged overarching conspiracy [not to "jump" any signed deal under] Count I cannot supply the purported motive because Count II [dealing only with HCA] is a separate, stand-alone count." In ruling on a motion for summary judgement, the Court need only conclude that there exists an issue of fact as to whether there was an agreement to "stand down" on HCA. Evidence relevant to Count II may be considered, even if such evidence is also relevant to Count I.

"jump a signed deal of [theirs]." Such evidence acts to bolster the other evidence tending to exclude the possibility of independent action by providing additional support as to the HCA Defendants' motive for the abrupt "stand down" in July.[3] Such evidence also acts to explain the reason for Carlyle, TPG, and Blackstone's subsequent pursuit of HCA in September.

For the foregoing reasons, the evidence, in the light most favorable to the Plaintiffs, supports the Court's prior holding that there exists an issue of fact as to whether the HCA Defendants entered an agreement to "stand down" on HCA in July of 2006.

### 2. Agreement to "Stand Down" in September.

Defendants argue that the chronology of events in September do not allow for an inference of a second agreement to "stand down" on HCA.[4] Defendants contend that the agreement in September could not have occurred until (1) after the HCA "go-shop" period had expired; (2) after the Winning Freescale Consortium had raised its bid for Freescale; and (3) after KKR had already unilaterally decided not to compete for Freescale.[5] The HCA Defendants contend that these facts negate the possibility that a September agreement was reached. The Court reaffirms its holding on this matter.

The evidence, in the light most favorable to the Plaintiffs, allows for an inference that a second "stand down" agreement on HCA occurred on September 15, 2006, before either the HCA or Freescale deal had closed. The evidence shows that, after KKR and Bain had submitted their indication of interest on Freescale, tensions between the parties were at an all-time high. The Winning Freescale Consortium believed that KKR and Bain's action was a blatant violation of an agreement, which had previously required them to "stand down" on HCA. KKR, Bain, and their partner in the Freescale transaction, Silver Lake, on the other hand, believed they had not violated any prior agreement to refrain from "jumping" Freescale because they had not technically "jumped" a *signed*

---

**3.** In a similar vein, Goldman Sachs contends that it could not have benefitted from a "stand down" on Freescale because, as an advisor to Freescale, its private equity arm was barred from taking part in any deal to purchase the company. Goldman Sachs argues that because it could not have benefitted from a "stand down" on Freescale, any mutual exchange to "stand down" on HCA would be implausible. As set forth above, Goldman Sachs's connection to an agreement to "stand down" on HCA can be inferred regardless of any motivation it had with respect to Freescale. The exchange for Freescale, however, is nevertheless relevant to the claim against Goldman Sachs. The evidence shows that KKR asked the industry to "stand down" on HCA and offered Carlyle and Blackstone some reciprocal benefit for doing so. The evidence further shows that Goldman Sachs, acting in conformity with Carlyle and Blackstone, complied with KKR's request by abruptly "standing down" on HCA. An infer-

ence can be made that Goldman Sachs, through its membership in the industry and its conformity of action, also received a benefit from KKR.

**4.** Evidence of a second "stand down" agreement in September between the Winning HCA Consortium and the Winning Freescale Consortium is ultimately superfluous to the other evidence showing a "stand down" agreement in July. For that reason, the Prior Order did not address the September agreement in its analysis section.

**5.** Defendants suggest that the Plaintiffs have conceded their claim in a prior motion by arguing that "[t]he Freescale LBO also offers a glimpse into what the world should have looked like for shareholders during the LBO boom of the conspiracy period." The Court does not view this statement as a concession that no agreement existed with respect to HCA.

deal.[6]

On September 12, 2006, members of the Winning Freescale Consortium, in apparent retaliation, discussed forming a competing consortium to topple KKR and Bain's HCA deal. Blackstone, who was particularly angered by KKR's action, communicated to KKR on that date the fact that it had signed a confidentiality agreement with HCA, the first step in pursuing a deal for the company. While the HCA fifty-day "go-shop" period also expired on September 12th, the Winning Freescale Consortium's discussions about competing for the HCA transaction on that date indicate their intention to pursue the deal after the expiration of the "go-shop" period.[7]

On September 13th and 14th, tensions between both sides continued as KKR, Bain and Silver Lake conducted due diligence on Freescale. On September 14th, the Winning Freescale Consortium raised its bid for Freescale and the deal was accepted the following day by the Freescale Board on September 15, 2006. As a result of the signed deal with the Winning Freescale Consortium, KKR, Bain and Silver Lake were removed from the due diligence process. KKR was angry with Freescale for signing the deal without allowing them to finish their due diligence. In an internal communication, a KKR ex-

ecutive asked "[h]ow did this happen? I thought they gave us two weeks to do our work? We told the company that we would not compete with a signed deal!!" Another KKR executive stated that, "although they were struggling, this is obviously a disappointment."

On September 15, KKR, Bain and Silver Lake discussed repairing relations with the Winning Freescale Consortium. KKR was especially interested in "officially tell[ing] the other side that [they would] stand down [on Freescale]." At this point in the chronology, it can be inferred that the Winning HCA Consortium was sending its official word to the Winning Freescale Consortium, at least in part, for the purpose of obtaining an agreement from the Winning Freescale Consortium to "stand down" on HCA.[8] While the HCA Defendants contend that KKR, Bain and Silver Lake had already independently decided not to pursue Freescale, the evidence supports an inference that KKR, Bain and Silver Lake nevertheless used a potential "stand down" on Freescale as a bargaining chip to repair relations and to secure an agreement to "stand down" on HCA.

The evidence shows that over the next couple days, the Winning HCA Consortium members made a number of calls to the members of the Winning Freescale

---

6. The evidence shows that KKR, Bain and Silver Lake believed that they were operating in conformity with the agreement because they had not jumped a "signed" deal. The evidence shows that KKR had "told [Blackstone] before it would not jump a signed deal of [theirs]" and had "told [Freescale] that [it] would not compete with a signed deal." KKR, however, admitted that it "would not have upset [the Winning Freescale Consortium's] previous deal if [it] had known how close [the Winning Freescale Consortium was to signing a deal]." Additionally, Silver Lake defended its action by stating that "we did not jump an almost signed deal."

7. Competing bids may have been made after the expiration of the "go-shop" period. The evidence shows that the deal for HCA did not ultimately close until November 11, 2006, after the shareholders had voted to approved the agreement's terms.

8. The evidence shows that KKR, Bain and Silver Lake were also concerned about their position in another transaction, Philips/NXP, for which members of both consortiums were currently involved.

Consortium to repair relations. In one communication, Henry Kravis of KKR reported back to his colleagues after communicating with the other side, stating: "I spoke with Tony James [of Blackstone] last night and Steve Schwarzmann [of Blackstone] this morning re Freescale. They are very happy campers that we are not going any further, since they now have a signed agreement. We got lucky!!!!" This communication, in the light most favorable to the Plaintiffs, allows an inference that, at that point, relations were restored and that the Winning HCA Consortium was "lucky" that the Winning Freescale Consortium were "happy campers" and had agreed to "stand down" on HCA.

Other communications also suggest that a mutual "stand down" occurred on September 15th. For instance, on that date, George Roberts of KKR wrote Tony James of Blackstone: "Congrats. Pls give me a call on cell ... Grr." On September 17, Tony James responded:

Thx for the call George. I talked to Henry [Kravis of KKR] Friday night and he was good enough to call Steve [Schwarzmann of Blackstone] Saturday. We would much rather work with you guys than against you. Together we can be unstoppable but in opposition we can cost each other a lot of money.

For the foregoing reasons, the evidence in the light most favorable to the Plaintiffs, supports the Court's prior holding that there exists an issue of fact as to whether Carlyle, TPG and Blackstone entered an agreement to "stand down" on HCA.

b. *Goldman Sachs's "Frenzied" Effort.*

Goldman Sachs challenges the Court's prior ruling that the evidence establishes that it "showed interest in the HCA transaction, but promptly 'stepped down' from making a topping bid within 48 hours of the commencement of the fifty-day 'go-shop' period." *Dahl,* 937 F.Supp.2d at 139. Goldman Sachs argues that the evidence shows that its investment banking division engaged in a "frenzied" effort to organize a rival consortium for HCA after any alleged agreement to "stand down" could have been reached. The Court reaffirms its prior holding on this matter.

The evidence, in the light most favorable to the Plaintiffs, supports a finding that Goldman Sachs, in conformity with the other HCA Defendants, promptly "stood down" from the HCA transaction around the time that KKR had asked the industry to "stand down." [9] The HCA deal was signed on July 24, 2006. Prior to that date, the evidence shows that Goldman Sachs was interested in HCA. On that date, Ken Hitchner, the Managing Director of Goldman Sachs, communicated to KKR its intention to "stand down" on HCA by stating "[y]ou know my style by now and my only message is that we are here to be helpful and if there is a significant role to play, GS and I would really appreciate strong consideration." Shortly after that date, on the morning of July 26th, KKR sent an intra-office email stating that "TPG and GS have both informed us that they will not compete on HCA." That email came within ninety-six hours of the commencement of the 50–day "go-shop" period.

Goldman Sachs argues a number of communications sent after the commencement of the "go-shop" period conclusively establish that its investment banking division was in a "frenzied" effort to put together a

---

9. The date at which KKR asked "the industry to step down on HCA," as relayed by a Carlyle executive, can be inferred to have oc- curred sometime before July 26, 2006, the date at which the evidence shows that Carlyle had clearly "stood down" on HCA.

competing consortium. The first communication is an internal Carlyle email sent on the morning of July 25th. The email states that "Goldman, Sachs is in a frenzy trying to organize a competing consortium (they have reached out to us, TPG and Blackstone as potential leads and have spoken with Warburg, GS PIA, Thomas Lee, Madison Dearborn as well)." This email merely creates an issue of fact as to whether, in the face of the other evidence, Goldman Sachs had ceased its pursuit of HCA upon KKR's request that the industry "stand down."[10] The other communications to which Goldman Sachs cites as support occurred on the 25th and 26th of July and merely show that Goldman Sachs was exchanging information it had collected about HCA with private equity firms. The last set of communications occurred between August 7 and August 9, 2006 and shows only that Goldman Sachs discussed a rumor that a potential consortium involving other private equity firms was forming to pursue HCA. These other communications, in the light most favorable to the Plaintiffs, fail to negate the existence of an issue of fact as to Goldman Sachs's prompt "stand down" on HCA.

c. *Evidence Supporting Independent Justification for Not Competing on HCA.*

The HCA Defendants contend that the Court disregarded evidence supporting their independent bases for "standing down" on HCA. The HCA Defendants cite to depositions and contemporaneous communications suggesting that each HCA Defendant "stood down" on HCA because a pursuit of the deal would have been costly and/or futile. For instance, on July 25, 2006, Steve Wise of Carlyle, in discussing the Winning HCA Consortiums' deal which had been signed the previous day, stated:

> My sense is that a competing consortium is a losing proposition. Tommy Frist [HCA's founder] is rolling over $800mm and is teamed up with KKR and Bain. I don't think they will lose and the likely outcome is forcing KKR and Bain to pay upwards of $1 billion more and souring two relationships.

In another correspondence, a TPG executive wrote to his colleague that he had told Merrill Lynch, the advisor to HCA's special committee, that "if the committee was so interested in receiving a competitive offer, they should never had agreed to a right to match, which would probably ensure that there would be no competitive offer."[11]

The Court concludes, as it did in the Prior Order, that this evidence, while strong, merely creates an issue of fact as to whether an agreement to "stand down" on HCA existed.

For the foregoing reasons, the Court denies the HCA Defendants' Motion for Reconsideration. The HCA Defendants' Motion for Reconsideration of the Court's Order Denying Summary Judgment on

---

10. The Carlyle executive that wrote the email may have been referring to the investment banking division's efforts up until July 24, 2006, prior to an agreement by Goldman Sachs to "stand down" on HCA. The email, therefore, in the light most favorable to the Plaintiffs, fails to negate the existence of an issue of fact as to Goldman Sachs's prompt "stand down" on HCA.

11. "Matching rights" are contractual rights giving the current bidders the ability to match any competing offer made to the company after the current bidders' offer has been accepted.

Plaintiffs' HCA Claim (Docket No. 807) is, hereby, DENIED.

SO ORDERED.